2024 IL App (2d) 230096-U
No. 2-23-0096
Order filed March 14, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| GEORGE STREET ACQUISITIONS, LLC, 5M RE, INC. d/b/a 5M Real Estate, Inc., and MARK J. REITER, | ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs and Counterdefendants-Appellants, | ) ) ) | |
| v. | ) ) | No. 19-CH-626 |
| PARIKH FAMILY COMPANIES, ELMHURST LAKE APARTMENT, LLC, PARK TERRACE PARTNERSHIP APARTMENTS, LLC, KERNEL PARIKH PROPERTIES, LLC-GPS I SERIES, VIRENDRA PARIKH PROPERTIES, LLC-GPS I SERIES, KERNEL PARIKH PROPERTIES, LLC-ROYAL CLUB SERIES, VIRENDRA PARIKH PROPERTIES, LLC-ROYAL CLUB SERIES, P & S PARTNER-SHIP, INC., REGENCY VILLAGE PART-NERSHIP, INC., REGENCY HOMES & DEVELOPMENT CO., and PARIKH FAMILY INVESTMENT MANAGEMENT CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Honorable |
| Defendants and Counterplaintiffs-Appellees. | ) ) | Janelle K. Christensen, Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:    In this case involving a real estate transaction that never closed, the trial court did not err in denying the plaintiffs' claims for specific performance and breach of the covenant of good faith and fair dealing, or in granting damages in favor of the defendants for the violation of the contract's confidentiality provision.

¶ 2    In 2018, the parties entered a real estate contract to purchase multiple parcels of real estate. The transaction never closed.  In April 2021, the plaintiffs, George Street Acquisitions, LLC (George Street), 5M RE Inc. d/b/a 5M Real Estate Inc. (5M Real Estate), and Mark Reiter, filed a multi-count complaint for, in relevant part, specific performance and  breach of the covenant of good faith and fair dealing.  The defendants, Parikh Family Companies, Elmhurst Lake Apartment LLC, Park Terrace Partnership Apartments LLC, Kernel Parikh Properties LLC-GPS I Series, Virendra Parikh Properties LLC-GPS I Series, Kernel Parikh Properties LLC-Royal Club Series, Virendra Parikh Properties LLC-Royal Club Series, P & S Partnership Inc., Regency Village Partnership Inc., Regency Homes & Development Co., and Parikh Family Investment Management Corporation, filed a counterclaim, in relevant part, for breach of the contract's confidentiality provision.  Following a bench trial, the trial court entered an order finding in favor of the defendants on all these claims.  The plaintiffs appeal from this order.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Mark Reiter and his brother, Marty, are the owners of 5M Real Estate and George Street. George Street was created solely for the transactions at issue and became a legal entity on September 25, 2018.  Reiter was a licensed real estate broker.  Kernel Parikh (KP) and Virendra Parikh (Raja), who are brothers, are the owners of all the defendant entities.  These entities owned an expansive portfolio of real estate, including apartment buildings.  KP had been in the business

of developing, building, managing, and selling apartment units for 35 years. KP had a master's degree in architecture and Raja was a licensed professional engineer.

¶ 5     In 2018, Reiter approached KP with a potential buyer for the Regency Village apartments, an apartment complex in Elmhurst. KP later advised Reiter that he wanted to sell all of the apartment buildings in his portfolio. Reiter's buyer was not interested in the entire portfolio.

¶ 6     In August 2018, Reiter sent KP a proposed agreement offering $70 million for KP's entire portfolio. The contract identified the purchaser as George Street. KP and Raja ultimately agreed to sell their portfolio for $75 million. Reiter, as the broker of 5M Real Estate, and KP, as president of the Parikh Family Companies, executed a commission agreement which provided that, if a sales contract was signed within a specified time frame, 5M Real Estate would receive a 3% commission at closing. Reiter intended to place this commission into the deal as the plaintiffs' equity contribution. They later executed a supplement to the commission agreement. The supplement provided that the commission was dependent on the sale closing within a certain time frame and that Reiter agreed to obtain prior written consent from KP before disclosing any rent rolls or financial information to any other party.

¶ 7                              A. The Agreement

¶ 8     On October 5, 2018, the parties executed a purchase and sale agreement (the Agreement) for the subject properties. The Agreement identified the buyer as George Street and Reiter as a member of George Street. It was structured as an equity deal, meaning that the plaintiffs would be purchasing an entity that owned the real property at issue, rather than directly transferring ownership of each individual property.

¶ 9     Section 1.1(h) of the Agreement provided:

"(h) *Due Diligence Period*: The period ending ninety (90) days after the Date of this Agreement. At or during any date or time of the Due Diligence Period, Seller(s) may alter the corporate or LLC ownership of the subject sale properties, for Seller's tax and/or family ownership purposes, prior to Closing. Attached, for information of the Parties hereto, is a preliminary draft of Seller's estate and tax attorney's "Parikh - Outline of Plan to Sell the Real Estate Portfolio", attached hereto as Schedule 1.3 (consisting of 3 pages). The allocation between the various Properties of the Purchase Price by Seller's estate and tax counsel may be assigned or directed at any time before Closing, subject to Purchaser's approval, which shall not be unreasonably withheld, conditioned, or delayed. Purchaser may extend the Due Diligence Period for one (1) period of thirty (30) days, provided Purchaser deposits an additional $100,000.00 (One Hundred Thousand and 00/100 Dollars) with the Escrow Agent not later than two (2) days after the expiration of the Due Diligence Period."

Section 1.1(g) of the Agreement defined earnest money as "$50,000.00 (Initial Earnest Money), and any additional deposit of Earnest Money Required herein, plus interest thereon." Section 1.1(i) stated that the financing period was the period ending 90 days after the date of the Agreement. Section 1.1(j) stated that the closing date was to be held 30 days after the expiration of the due diligence period.

¶ 10     Section 1.3 of the Agreement provided:

"*Earnest Money*. The Initial Earnest Money, in immediately available federal funds, evidencing Purchaser's good faith to perform Purchaser's obligations under this Agreement, shall be deposited by Purchaser with the Escrow Agent not later than two (2) business days after the full execution of this Agreement. Upon

Purchaser's satisfactory conclusion of the Due Diligence Period, as may be extended as set forth in Article 1.1(h), Purchaser shall deposit with the Escrow Agent, as Additional Earnest Money, the sum equal to an amount which will increase the total Earnest Money to 2% of the Purchase Price (in Par. 1.1(f) hereof), being $1,500,000.00. The Earnest Money shall be applied to the Purchase Price at Closing. In the event that Purchaser fails to timely deposit the Initial Earnest Money, or the Additional Earnest Money, if applicable, with the Escrow Agent, this Agreement shall be of no force and effect. If this Agreement terminates prior to the deposit of the Additional Earnest Money, pursuant to any express right of Seller or Purchaser to terminate this Agreement, (subject to Par. 2.5 hereof) the Earnest Money shall be refunded to Purchaser immediately upon request, and all further rights and obligations of the parties under this Agreement shall terminate. However, upon deposit of the Additional Earnest Money, and absent any breach of this Agreement by Seller, all of the Earnest Money (i) shall then be non-refundable in the event of a termination, breach or default of this Agreement by Purchaser, and (ii) shall then be Sellers' funds as (a) a part of the Purchase Price paid by Purchaser at Closing, or (b) as liquidated damages payable to Seller, if Purchaser does not proceed to Closing. ***."

While this final version of the Agreement did not give a specific day when the additional earnest money had to be paid, one earlier draft stated that it was to be paid on the 60th day of the due diligence period and another draft stated that it was due on the 90th day of the due diligence period.

¶ 11    Section 2.2 of the Agreement provided that the parties agreed that the property information, such as the rent rolls, would be maintained in strict confidence. It further stated that the buyer and

seller acknowledged, in the event of a breach of confidentiality, "that there may be no adequate remedy at law and that either Party shall have the right to seek injunctive relief." It further provided that:

> "The Purchaser shall be entitled to disclose confidential information to potential investors and financing sources, provided each such investor or financing source executes a non-disclosure agreement."

This section also included a liquidated damages clause such that if the broker violated the terms and conditions of confidentiality, and the transaction did not close, the broker would pay the sum of $25,000 as liquidated damages to be split equally between buyer and seller.

¶ 12    Section 2.5 of the Agreement provided that buyer could terminate the Agreement during the due diligence period and receive a refund of its earnest money, minus half the cost for any preliminary title commitments and surveys. Section 8.2 provided that if the seller defaulted, the buyer could seek return of its earnest money or pursue a claim for specific performance but could not pursue a claim for damages. Section 10.9 of the Agreement provided that time was of the essence in the performance of the Agreement.

¶ 13    The Agreement had schedules attached. Schedule 1.2 listed all the properties for sale and the corporate entities that owned each property. Schedule 1.3 outlined the structure of the equity sale and included a diagram of the transaction. Specifically, Schedule 1.3 identified the entities that owned the subject property, provided that those entities would transfer their interests in the properties to a new entity, Parikh Holding LLC, and that the members of Parikh Holding would then sell their membership interest in Parikh Holding to George Street. The sale proceeds would be transferred into a new entity, Parikh Investments, LLC.

¶ 14    On December 6, 2018, the Agreement was split into two separate contracts. The first contract, which we will still refer to as the "Agreement," was for $74.5 million and involved the equity sale of the apartment buildings owned by the defendants. The second contract (the ancillary contract) was for $500,000 and involved the sale of all the remaining real property, which included land and some houses. The purpose of the split was to allow the plaintiffs to obtain financing. The defendants' attorney, Don Russ, needed to prepare a new Schedule 1.3 for each of the split contracts. He provided those on December 29, 2018. The record demonstrates that, in a December 10, 2018, email from the defendants' attorney, James Bakk, to KP and Raja, Bakk wrote "And, the issue regarding the non-refundability of the $1.35 earnest money after the expiration of the Due Diligence period" has been made clear in both of the contracts.

¶ 15                    B. Post-Agreement Actions and Correspondence

¶ 16    Also on December 6, 2018, the plaintiffs executed a term sheet with their lenders, Pensam Funding, Inc. (Pensam) and Equitrust Life Insurance Company (Equitrust). The term sheet contained preliminary terms and conditions of the loan in response to 5M Real Estate's loan application for $72.4 million. The term sheet stated that it did not represent a formal or binding agreement by the lender. Ray Cleeman was the contact for Pensam and Brad Feine was the contact for Equitrust. The loan included about $9 million to finance the plaintiffs' plan to renovate the properties. 5M Real Estate's equity partner in this transaction was Castlerock. Sebastian Barsh was the contact person for Castlerock. Castlerock and 5M Real Estate's joint venture was called 5M Rock Holdings, LLC. The record indicates that 5M Rock Holdings was planning to provide about $15 million in equity and the rest of the purchase price for the transaction was being financed through the lenders.

¶ 17    On December 31, 2018, the plaintiffs exercised the one time right, under section 1.1(h) of the Agreement, to extend the due diligence period for 30 days and made the requisite $100,000 earnest money deposit.  At that point, the due diligence period was to end on February 5, 2019.  On January 10, 2019, the plaintiffs advised the defendants that its' lenders wanted to use a different structure for the equity sale of the properties.  It essentially made modifications to how the entities would be transferred upon closing.  On January 17, 2019, the defendants agreed to the new structure and Russ was to update the Schedule 1.3s accordingly.

¶ 18    By January 28, 2019, Russ had not provided the updated schedules.  On that date, however, the plaintiffs' attorney, Cory Faulkner, sent a proposed amendment to the Agreement that included, in part, new changes to how the entities would be transferred upon closing and a new provision whereby KP and Raja would provide personal indemnity for any claims related to the subject properties being sold.  The amendment also included an "additional contingency" that essentially allowed the plaintiffs to back out of the deal at any time up to the closing date if the plaintiffs could not obtain financing on terms that would permit what was contemplated by paragraph 4 of the proposed amendment.  It also added a place to the signature pages of the Agreement for KP and Raja to sign "individually" under a statement that "the undersigned herby join in this Amendment to evidence their agreement to the terms of the 'Indemnity' Paragraph of this Amendment."  In the email, Faulkner requested another two week extension to the due diligence period, such that it would end on February 19, 2019 (rather than February 5).

¶ 19    On January 31, 2019, Bakk sent Faulkner an email with the updated Schedule 1.3s attached.  Bakk also stated:

"Insofar as the amendment #1 to the contracts *** Don Russ advises that this amendment would undo everything in the Schedule 1.3 Outlines + Charts to the contracts, which I can assure you would not be acceptable to my clients.

To allow for some discussion (including Don Russ), my clients accept your requested extension of the Due Diligence/Financing period to 2/19/19."

The record shows that on February 5, 2019, Bakk emailed Faulkner a written and executed extension to the due diligence period, extending it to February 19.

¶ 20    On February 4, 2019, Faulkner sent a revised amendment via email.  He agreed that the closing should take place in accordance with the revised schedules sent on January 31.  He stated that he removed the provisions from the proposed amendment that he believed were objectionable. This revised amendment essentially removed language that Faulkner believed would conflict with the new Schedule 1.3s but also expanded the personal indemnity language.

¶ 21    On February 7, 2019, Faulkner sent a follow-up email to Bakk and Russ asking whether the revised amendment addressed their concerns and stating that, if not, "please feel free to redline any language you would like removed or changed."  Having no response, Faulkner sent another email on February 11 stating, "We need to have the amendment agreed to and executed before we can finalize everything with our lender, as a significant portion of the loan items *** are dependent on the sale structure."  Faulkner received an email response from Russ stating that he was out of town for a meeting and that he would "get with [Bakk] later this week."

¶ 22    On February 12, 2019, Faulkner sent a third email requesting a response to the amendment and stating, "We are running up against our financing contingency date on [February 19], and we cannot finalize the loan documents, until the amendment is agreed to and executed. *** We are

using our best efforts to get this closed, but we are in a difficult position while the terms of the amendment remain outstanding."

¶ 23 On February 14, 2019, Faulkner sent a fourth email, which stated, "Everyone on our side is ready to push to the finish line when we have the signed amendment, but at this point, we are going to need beyond Tuesday to finalize the loan." He then requested another two-week extension of the due diligence and financing contingencies. Bakk responded by email that same day. He sent a revised amendment. In relevant part, it removed the language related to personal indemnity and eliminated the additional contingency, which allowed the plaintiffs to cancel up until the closing date with no penalty if appropriate financing was not obtained. It also removed the signature lines where KP and Raja were supposed to sign "individually." The email closed with: "This revised Amendment is acceptable to Sellers, so let me know if it's good to go ***." Bakk did not respond to the request for another extension.

¶ 24 On February 15, 2019, at 4:46 p.m., Bakk forwarded additional changes to the amendment that Bakk received from Russ. There was again no response to the request for another extension of the due diligence or financing contingencies. Russ had made minor additional changes to the revised amendment. The changes were shown on the clean copy of the revised amendments that Bakk had sent to Faulkner. However, the place for KP and Raja to sign "individually" reappeared on Russ's version of the revised amendment.

¶ 25 On February 18, 2019, at 4:45 p.m., Faulkner sent Bakk an email asking him to extend the due diligence period for two weeks—until March 5, 2019. At 6:42 p.m., Faulkner sent an email to Bakk and Russ with another revised amendment. Faulkner's revisions added the personal indemnity language back into the amendment.

¶ 26    On February 19, 2019, at 7:42 a.m., Bakk sent Faulkner an email that stated any extensions or amendment requests needed to be handled by Russ. At 5:49 p.m., having been unable to contact Russ, Faulkner sent Bakk and Russ the following email:

"Please note that buyer reserves all rights to terminate the contract and receive a full refund of its earnest money in the event an extension is not agreed to hereafter.

It remains our intention to proceed with the contract, if the extension is granted, and this shall not be taken as our expression of intent to terminate the contract while the proposed extension is pending."

The due diligence period ended that day and the plaintiffs did not deposit the additional earnest money as called for by section 1.3 of the Agreement.

¶ 27    On February 20, 2019, Faulkner sent an email to Bakk and Russ still pursuing an extension to the due diligence period and noting that the plaintiffs had been acting in good faith to resolve the issues related to the amendment. Faulkner stated that, "We need a resolution of the extension request to determine how to move this transaction forward." Later that day, Bakk sent the following response:

"Regarding your client's [third] extension request *** the sellers have not and will not grant another extension ***. The Sellers thereby accept your client's termination of the subject $74.5M and $500K contracts. Sorry things did not work out."

¶ 28    The record indicates that, thereafter, the plaintiffs did not try to get a refund of the earnest money already paid. Rather, on February 24, 2019, the plaintiffs, the lenders, and the equity partners had an "all hands on deck meeting." They determined that they could close the transaction without an amendment. The transaction never closed and the plaintiffs filed this suit.

¶ 29    On April 9, 2021, the plaintiffs filed their first amended six-count complaint. The plaintiffs alleged claims for specific performance (count I), damages for lost rent and income (count II), and fraud (count VI). The plaintiffs also alleged three claims for breach of contract. Count III sought damages for breach of the Agreement and the ancillary contract. Count IV alleged a breach of contract based on a breach of the implied covenant of good faith and fair dealing. Count V alleged a claim for breach of the commission agreement.

¶ 30    As is relevant to the arguments raised on appeal, we note that, in count I, the plaintiffs alleged that they were entitled to specific performance because the defendants improperly terminated the Agreement on February 20, 2019, the defendants waived the time is of the essence provision, and because the plaintiffs were ready, willing, and able to perform their obligations under the Agreement and ancillary contract. In count IV, the plaintiffs alleged that the defendants acted in bad faith in failing to negotiate the proposed amendment to the Agreement in a reasonable manner and in failing to notify the plaintiffs within a reasonable time that they would not grant another extension to the due diligence period. The plaintiffs further alleged that, had they been informed that there would be no extension and that the defendants did not agree to Faulkner's February 18th redline changes to the proposed amendment, they would have been able to timely deposit the additional earnest money and proceed to closing. In count V, the plaintiffs alleged that the defendants breached the Agreement and the ancillary contract to avoid paying Reiter his commission and that, because Reiter fully performed under the commission agreement, the defendants were still required to pay it. In count IV of the counterclaim, the defendants alleged that the plaintiffs breached section 2.2 of the Agreement, the confidentiality provision, and that they were entitled to damages.

¶ 31    The defendants filed an answer, affirmative defenses, and counterclaims.    As counterclaims, the defendants alleged that the plaintiffs breached: the implied covenant of good faith and fair dealing (count I); fiduciary duties (count II); the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2018) (count III); and the confidentiality provisions of the Agreement and ancillary contract (count IV).    The defendant also requested specific performance of the contractual requirement to return all confidential documents since the closing did not occur (count V).    Count V of the counterclaim was later withdrawn because the documents were returned.

¶ 32    On July 6, 2021, following a hearing on the parties cross-motions for summary judgment, the trial court granted summary judgment in favor of the defendants on all of the plaintiffs' claims and summary judgment in favor of the plaintiffs on all of the defendants' counterclaims except count IV, alleging a breach of the Agreement's confidentiality provision.    On September 30, 2021, the trial court granted the plaintiffs' motion to reconsider and reinstated count I (specific performance), count IV (breach of the covenant of good faith and fair dealing), and count V (breach of the compensation agreement) of the plaintiffs' complaint.    The matter proceeded to trial on those counts and on count IV (breach of confidentiality) of the defendants' counterclaim.

¶ 33                                C.  Trial Testimony

¶ 34    A two-week bench trial commenced on August 15, 2022.  At trial, Faulkner testified that the Agreement was split into two contracts to accommodate financing.  Faulkner acknowledged sending a revised amendment on February 4, 2019, that included more with regards to representations and warranties based on the equity nature of the transaction.  It also included personal indemnification from KP and Raja to indemnify the purchasers and the related entities from any liabilities that might pass to the purchasers after closing.  Faulkner testified that he never

received any subsequent communications informing him that KP and Raja would never agree to personal indemnification or reiterating that time was of the essence.

¶ 35    Faulkner further testified that, in addition to his emails, he also left a voicemail for Russ on February 11. He was trying to get the amendment resolved. Faulkner requested another two-week extension to the due diligence period. On February 14, he received redlines to the amendment from Bakk but there was no response as to extending the due diligence period. Faulkner testified that the email did not express that the defendants refused any kind of personal indemnification. Faulkner acknowledged that Bakk's redlines eliminated any language regarding personal indemnity and removed the signature lines at the end of the amendment designated for KP and Raja to sign individually. Faulkner testified that he never received a response from the defendants regarding his request for another extension to the due diligence period.

¶ 36    Faulkner acknowledged that Russ had also sent revisions to the amendment on February 15. Russ's version included the signature lines for KP and Raja to sign individually. Faulkner believed that, because Russ did not remove the signature lines, the defendants had essentially agreed to personal indemnification.

¶ 37    Faulkner testified that, when he was granted previous extensions to the due diligence period, it was handled by Bakk. However, on February 19, he received an email from Bakk stating that any amendment or extension requests needed to be handled by Russ. Faulkner sent Russ a couple emails that day but received no response from Russ. He received a response from Russ's assistant that stated Russ was out of town on the 18th and 19th and would be in meetings all day on those days. The assistant also said that she sent Russ an email explaining the urgency of the extension request. Faulkner testified that he was contacting everyone to try to reach Russ to resolve the amendment and extension request prior to February 19 but he was unsuccessful. On

the evening of February 19, he sent an email stating that the plaintiffs reserved the right to cancel the contract and receive a full refund of the earnest money if the defendants did not agree to a due diligence extension.

¶ 38    Faulkner testified that he sent two more emails on February 20, expressing that the plaintiffs still wanted to proceed with the transaction.  Bakk sent a response stating that the defendants would not grant an extension and that the "Sellers thereby accept your client's termination" of the Agreement and the ancillary contract.  Thereafter, Faulkner and Reiter continued to try to reach out to the defendants to resolve the issues and proceed with the transaction.  Faulkner, Reiter, and the lenders had an "all hands on deck" conference call on February 24, 2019.  After discussions, everyone agreed, including the lenders, to proceed with the closing of the Agreement as it was written and to forgo the requested amendment.  Faulkner testified that if the defendants had timely denied the extension request and any amendments, the plaintiffs could have had the "all hands on deck" conference call sooner and proceeded to close.

¶ 39    Faulkner testified that he did not believe the defendants had the right to terminate the contract on February 20.  He believed that the additional earnest money was not due until a reasonable time after the conclusion of the due diligence period.  However, the record also shows that, on December 10, 2018, Faulkner wrote an email to Bakk, which stated, in part, that "[w]e are all in agreement that the full amount of the earnest money will become non-refundable after the Due Diligence Period" and that "the full $1,500,000 will be non-refundable as of the last day of the Due Diligence Period."

¶ 40    Reiter testified that the plaintiffs were ready and able to pay the additional earnest money on February 19, 2019.  Reiter stated that, in February 2019, the defendants never told anyone that that KP and Raja would never agree to personal indemnity.  Reiter said there were multiple phone

calls and emails trying to get a response from the defendants about the amendment. By February 18, they still had not received a response. Reiter tried to call KP and Raja multiple times on February 19 to get a response but they did not answer.

¶ 41    Reiter further testified that the plaintiffs had an operating agreement with Castlerock and Castlerock was going to provide the additional earnest money. Castlerock's attorney told him multiple times that Castlerock had access to the necessary funds. Reiter testified that the understanding between all the parties was that the additional earnest money was due within a reasonable time after the conclusion of the due diligence period. Reiter identified an email he received from his equity partner, Sebastian Barsh, on January 31, 2019, wherein Barsh stated that the additional earnest money was ready for deposit. Reiter acknowledged that Barsh also stated that the additional earnest money was conditioned on the plaintiffs being squared away with their loans and an operating agreement.

¶ 42    On February 22, 2019, in a text message exchange with Barsh, Reiter suggested that they wire the additional earnest money to keep the Agreement and ancillary contract enforceable. Barsh responded that he was not sure whether there was an enforceable contract and he did not deposit the additional earnest money. Reiter further testified that, on February 28, 2019, plaintiffs and their equity partners exchanged multiple emails and reached a strategy for closing without any amendment. He also acknowledged that he provided information regarding the Agreement to multiple individuals when he was trying to find lenders and equity investors. When doing so, he was acting in his capacity as a buyer, not a broker. He could not recall whether he procured any non-disclosure agreements before he provided the information.

¶ 43    Sebastian Barsh testified that he was the owner of Castlerock Properties. Castlerock developed and invested in real estate. Castlerock did not have any assets. Castlerock entered into

an operating agreement for a joint venture with 5M Real Estate to purchase the subject property owned by the defendants. He had two investors, Ryan Daube and Owen Schnaper, who were also supplying funds through Castlerock to purchase the subject property. He acknowledged that, under the operating agreement with 5M Real Estate, Castlerock was responsible for supplying the additional earnest money ($1.35 million). Daube specifically was supplying the additional earnest money. Daube had supplied the $100,000 of earnest money that was paid when they exercised the contractual right to extend the due diligence period for 30 days. He testified that, as of January 31, 2019, it was Castlerock's intention to move forward with depositing the additional earnest money and that the money was available. The additional funds Castlerock was supplying at closing were also available.

¶ 44　Barsh acknowledged that he received an unexpected email from Bakk on February 20, 2019, saying that the deal was off. He testified that everyone involved in the purchase was surprised and trying to figure out what was going on. After the email from Bakk, he sent an email to the plaintiffs stating that he would not be depositing the additional earnest money. Barsh testified that this was because he was worried that if the deal was in limbo, the earnest money could get stuck. He believed the defendants were not acting in good faith. At the time of his testimony, he was still interested in being an equity partner in the transaction.

¶ 45　On cross-examination, Barsh acknowledged that he did not have anything in writing from Daube or Schnaper stating that either agreed to be personally responsible for depositing the additional earnest money. Castlerock, Barsh, Daube, and Schnaper could have walked away from the deal at any time. They had no obligation. At any point, they could have decided not to deposit the additional earnest money. Initially, he did not pay the additional earnest money because it seemed like the deal would not move forward unless the defendants signed an amendment and he

did not want the money to be held up in escrow for a long time. After receiving the Bakk email terminating the Agreement, he did not want to deposit the additional earnest money because he was again worried that he would not get it back if the deal did not close. Barsh acknowledged that Castlerock was to deposit $12.5 million in an escrow account to be used to fund the subject deal. The money was never deposited in an escrow account.

¶ 46    Barsh identified a January 4, 2019, email he sent to Reiter. In that email he wrote that they were almost through the due diligence period and there was nothing from the lenders showing that they were aware it was an equity deal or that the lenders would even allow it. He wrote, "If we didn't know the lender had no clue or hasn't given express written consent to permit the equity deal we probably wouldn't have wired the 100k already." Barsh also identified a January 9, 2019, email he sent to Reiter. In that email, he stated that the lenders were opposed to closing in an equity structure. Barsh testified that he learned this from Cleeman, who was the only person from the lender's side with which he spoke.

¶ 47    Barsh acknowledged that he received an email from Reiter on November 9, 2018, that included an attachment called "Lake County Confidential Offering Memorandum." Reiter informed him that he had sent the information about the deal to over 100 groups. Barsh acknowledged that he received the agreement without signing a nondisclosure agreement (NDA). Barsh spoke with a couple others about the deal and he also did not obtain NDAs before doing so. In 2020, after the deal was no longer alive, Reiter asked Barsh to sign and back date an NDA. Barsh signed one but did not back date it. Barsh acknowledged that, on February 20, 2019, Reiter sent him an email stating that the Agreement could be kept enforceable if the additional earnest money was paid. Barsh responded that he was not sure they had something that was enforceable in court and that they needed to figure out what was really going on.

¶ 48    The record indicates that the joint venture between Castlerock and 5M Real Estate was called 5M Rock Holdings, LLC. On February 18, 2019, Castlerock and 5M Real Estate executed an operating agreement for 5M Rock Holdings. The operating agreement did not identify which equity member was responsible for paying the additional earnest money. In an email chain dated February 28, 2019, Barsh wrote that it was inconceivable that Bakk did not understand why the buyers needed personal indemnification but that he was still willing to deposit the additional earnest money if Reiter provided personal indemnity that would cover any potential risk associated with moving forward on the transaction.

¶ 49    Bakk testified that he was involved with the original negotiation of the Agreement. It was originally an asset transaction but, at the request of the defendants, it became an equity transaction. An equity transaction involved the sale of the entities that owned the subject real estate and it saved the defendants millions of dollars in federal recapture taxes. Bakk acknowledged that, although the Agreement was signed on October 5, 2018, the initial earnest money was not deposited until October 11, 2018, because the escrow account was not set up in time to meet the contractual two-day deadline and the defendants agreed to the extension. The original 90-day due diligence period ended in the beginning of January. The plaintiffs exercised their contractual right to one 30-day extension of the due diligence period and timely deposited the required additional $100,000 of earnest money. The extension included the financing contingency too. Bakk acknowledged that the first two extensions of the due diligence period were agreed through communication between him and Faulkner.

¶ 50    On January 10, 2019, Bakk received a request from Faulkner to make some modifications to the equity structure of the deal. Russ and the defendants agreed on January 17, 2019, to the requested modification. The requested modification required Russ to redo the Schedule 1.3s. In

Bakk's mind, no other changes were needed before closing. However, on January 28, 2019, Faulkner sent an email stating that the plaintiffs needed another extension to the due diligence period because they still had not received revised schedules from Russ. Bakk replied three days later that the defendants agreed to a two-week extension, to February 19, 2019. Bakk prepared a document stating as such, had it signed by the defendants, and emailed it to Faulkner. Bakk testified that the extension was agreed to because the defendants were negotiating in good faith and attempting to close on both contracts.

¶ 51     Bakk testified that Faulkner's January 10 email also requested other modifications to the Agreement, specifically, personal indemnification from KP and Raja, and for an extension on the closing date. Bakk testified that Faulkner had tried to include a personal indemnity provision in one of the original drafts of the Agreement. At that time, which was prior to October 5, 2018, Bakk told Faulkner that KP and Raja would never agree to personal indemnity. Bakk responded to Faulkner on January 31, 2019, stating that the new proposed amendment to the Agreement was not acceptable. He informed Faulkner on January 31, February 4, and on February 14, that the defendants would not accept an amendment that included personal indemnity. Faulkner told him that the plaintiffs needed the proposed amendment in order to get financing.

¶ 52     Bakk testified that, on February 14, 2019, he sent an email with a redlined and clean copy of the proposed amendment to which the defendants would agree. He sent another email on February 15 with changes proposed by Russ. The February 15 version included the signature lines for the indemnity provisions even though the signature lines were crossed out on the February 14 version Bakk sent. Bakk stated that he forgot to remove the signature lines from the February 15 version. (The record shows that Russ also testified at trial and corroborated that the inclusion of the personal indemnity signature lines was an oversight.) Thereafter, Faulkner continued to seek

personal indemnity and an extension to the due diligence period. Bakk testified that when Faulkner sent another revised amendment on February 18, 2019, Faulkner had changed most of the provisions back to what was sent on February 4, which Bakk had already told him were unacceptable.

¶ 53    Finally, Bakk testified that, as of February 14, 2019, he did not know if the defendants would have agreed to another extension of the due diligence period  because he did not know whether the plaintiffs were going to agree to redlined amendment that was acceptable to the defendants. The defendants were intending to close up until the end of the day on February 19, 2019, as long as the plaintiffs paid the additional earnest money. Bakk testified that the additional earnest money was nonrefundable at the conclusion of the due diligence period.

¶ 54    Brad Feine testified that Equitrust did not issue written loan commitments. Equitrust generally finalized loans about one or two days before closing. Feine acknowledged that, on February 19, 2019, he sent an email to Pensam which stated, "They are waiting on execution of the first amendment to the [Agreement] before they put [earnest] money down hard. Likely won't be today." He was referring to the buyers and the sellers. Putting money down hard meant that once you put the earnest money down, you could not get it back—it was nonrefundable. Feine acknowledged that, as of February 19, 2019, there was an open item on Equitrust's loan checklist— equity verification. Since the lenders were only providing funding of $63.5 million, Equitrust needed to verify that the plaintiffs had the remaining necessary funds to provide at closing. Equitrust had requested financial statements from the plaintiffs but had not received them.

¶ 55                              D.  Trial Court's Ruling

¶ 56    At the close of trial, the trial court requested that each side provide a statement of facts and written closing arguments. On February 23, 2023, the trial court entered a written memorandum

opinion and judgment. The trial court first addressed whether the additional earnest money was due prior to the expiration of the due diligence period or within a reasonable time following the expiration. The contractual language stated that "[u]pon purchaser's satisfactory conclusion of the Due Diligence Period *** purchaser shall deposit" the additional earnest money. The trial court determined that the word "upon" was ambiguous because various dictionary definitions included "on" and "immediately," but also "thereafter" or "very soon after." The trial court thus turned to parole evidence to determine when the additional earnest money was due. The trial court noted that email communications between the parties during the period that the contract was pending all indicated that the additional earnest money would be non-refundable after the due diligence period. The trial court also noted that, under the Agreement, the initial earnest money was due two days after the Agreement was signed, and the contractual right to extend the due diligence period for 30 days required an earnest money payment of $100K within two days after the expiration of the due diligence period. The trial court noted, however, that the provision requiring the payment of the additional earnest money of $1.35 million did not include any similar two-day provision. The trial court concluded that "if the earnest money is non-refundable after the Due Diligence period expired on February 19th, logic dictates that Buyer had to deposit the additional earnest money on or before the expiration of the Due Diligence period." The trial court thus held that "upon" meant that the additional earnest money was to be paid no later than February 19, 2019.

¶ 57 The trial court denied the plaintiffs' claim for specific performance, finding that the plaintiffs had not shown they were ready, willing, and able to deposit the additional earnest money on February 19, 2019. The trial court found that the plaintiffs did not disclose the equity structure of the Agreement to the lenders until January "and then the lenders baulked [*sic*] and demanded an amendment to the [Agreement] to cure their perceived defect." Barsh elected not to pay the

additional earnest money because he was not sure whether the parties would reach an agreement regarding the amendment and thus whether the lending would come through. Further, the trial court noted that Barsh and the other lenders were not contractually bound to provide the equity or financing. The trial court noted that Daube and Schaper did not testify at trial and there was no evidence that they had committed to providing the additional earnest money. The trial court also noted that the lenders' decision to finance the transaction without an amendment five days after the due diligence period was irrelevant as the additional earnest money was due on February 19th and was not paid.

¶ 58 The trial court then addressed the plaintiffs' argument that the defendants waived the contractual time is of the essence clause and thus waived the February 19 due diligence deadline. The trial court found this argument to be without merit. The trial court noted that the parties agreed to the two-day extension for payment of the initial earnest money because the escrow account had not been set up. The trial court also noted that the plaintiffs exercised the contractual right to one 30-day extension of the due diligence period and paid another $100,000 in earnest money. The trial found that, if the plaintiffs really believed that the defendants waived the time is of the essence by allowing the two-day extension for the initial earnest money, they would not have paid the extra earnest money. The trial court also found that the defendants did not waive the time is of the essence clause of the contract by granting an additional two-week extension, from February 5 to February 19. The trial court noted that the defendants did not let the due diligence period lapse, and then grant an extension. Rather, the defendants timely granted the request for the extension and set the new due date of February 19. The trial court stated that if the plaintiffs really believed the defendants waived the time is of essence clause, they would not have continually reached out seeking agreement to an extension. The trial court also found telling that, after the additional

earnest money was not paid on February 19, the defendants terminated the Agreement the next day. The trial court concluded that the defendants did nothing to lull the plaintiffs into believing that it would grant another due diligence extension.

¶ 59    The trial court denied the plaintiffs' claim for breach of the covenant of good faith and fair dealing. The trial court found credible Bakk's testimony that he told the plaintiffs when negotiating the original October 2018 Agreement that the defendants would never agree to personal indemnity. The trial court also noted that Barsh's January 4, 2019, email indicated that, as of that date, Reiter had not informed the lenders that the sale was structured as an equity deal. The trial court found that this was why "the lenders balked which caused [the plaintiffs] to scramble to try and renegotiate the [Agreement] terms." The trial court found that the plaintiffs were on notice that personal indemnity was not acceptable as of January 31, 2019, when Bakk informed them of this. The trial court found that the plaintiffs should have had their "all hands on deck call" at this time and not five days after the due diligence period ended. The trial court concluded that the defendants exercised the discretion to not extend the due diligence period reasonably and with proper motive.

¶ 60    The trial court acknowledged that the defendants never responded to the request for an extension but found that this was not a breach of the covenant of good faith as the plaintiffs were well aware by February 19 that the defendants would not agree to personal indemnity. The trial court noted that the deal did not end because the defendants did not respond to the requests for an extension. Rather, the deal ended because the plaintiffs failed to pay the additional earnest money to secure the right to move forward with the deal. The trial court found that, even if the defendants were ultimately happy that the deal fell through, the termination of the deal rested on the plaintiffs' failure to timely secure proper financing from its lenders.

¶ 61    The trial court also denied the plaintiffs' claim for breach of the commission agreement. The trial court found that Reiter was not entitled to the commission because the deal fell through and the defendants did not act in bad faith.

¶ 62    As to the defendants' counterclaim for breach of the confidentiality of the Agreement, the trial court noted that the Agreement clearly required Reiter to obtain non-disclosure agreements from potential lenders and investors before providing confidential information. The trial court found that Reiter failed to comply with this requirement and even requested one lender to postdate a confidentiality agreement. The trial court thus found in favor of the defendants and awarded $25,000 in damages. Following the trial court's ruling, the plaintiffs filed a timely notice of appeal.

¶ 63                              II. ANALYSIS

¶ 64                           A. Specific Performance

¶ 65    The plaintiffs' first contention on appeal is that it was entitled to specific performance of the subject contracts for two reasons: (1) the defendants breached the Agreement; or (2) the plaintiffs were ready, willing, and able to perform on the Agreement but were prevented from doing so by the defendants' actions. "Generally, a party will be entitled to specific performance of a contract for conveyances of real estate only upon establishing either that the party has performed according to the terms of the contract or that the party was ready, willing and able to perform but was prevented, and thus excused from doing so by the acts or conduct of the other party." *Omni Partners v. Down*, 246 Ill. App. 3d 57, 63 (1993). Specific performance is an equitable remedy that may only be "exercised upon consideration of all the facts and circumstances of a particular case." *Id.* at 62. A trial court's decision to grant or deny such relief will not be disturbed absent an abuse of discretion. *Id.*

¶ 66                          1. Breach of the Agreement

- 25 -

¶ 67    The plaintiffs argue that they were entitled to specific performance because the defendants breached the Agreement by improperly terminating it when the additional earnest money was not paid on February 19, 2019.  Paragraph 1.3 of the Agreement provided that the additional earnest money was due "[u]pon [the plaintiffs] satisfactory conclusion of the Due Diligence Period."  The trial court found that the term "upon" was ambiguous and interpreted it to mean that the additional earnest money was due on or before February 19.  On appeal, the plaintiffs concede that the term "upon" is ambiguous but argue that the parole evidence does not support the trial court's interpretation of that term.

¶ 68    In so arguing, the plaintiffs cite an email from Bakk to KP and Raja, wherein he wrote, "And, the issue regarding the non-refundability of the $1.5 earnest money *after* the expiration of the Due Diligence period has been clear in Par, 5.2(e) [of the ancillary contract] and in Par. 5.2(d) [of the Agreement]."  (Emphasis added.)  The plaintiffs argue that this email meant that the additional earnest money was not due until after the due diligence period expired.  The plaintiffs also point out that preliminary drafts of the Agreement specified that the additional earnest money was due on the 60th day of the due diligence period and another specified that it was due on the 90th day of that period.  The plaintiffs assert that since the final version of the Agreement did not list a specific due date, the parties intended that the additional earnest money would be due within a reasonable time after the expiration of the due diligence period.  Accordingly, the plaintiffs argue that the defendants breached the Agreement by terminating it on February 20th rather than allowing the plaintiffs a reasonable amount of time to pay the additional earnest money and that the only equitable remedy is specific performance.

¶ 69    In construing a contract, our primary objective is to give effect to the intent of the parties. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2001).  If the provisions of a contract are unambiguous,

we ascertain the parties' intent from the language chosen in the contract. *Id.* However, if the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Id.* A contract is ambiguous if it can reasonably be interpreted as having more than one meaning or its language is indefinite in expression. *West Bend Mutual Insurance Company v. Athens Construction Company, Inc.*, 2015 IL App (1st) 140006, ¶ 27. The determination of whether a contract is ambiguous is a question of law for a court to decide. *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 888 (1995). If a contract is ambiguous and the trial court uses extrinsic evidence to determine the parties' intent, the interpretation of the language is a question of fact (*Chicago Principals Association v. Board of Education*, 84 Ill. App. 3d 1095, 1099 (1980)), and, as a result, the trial court's decision will not be reversed unless it is against the manifest weight of the evidence (*Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985)).

¶ 70   In the present case, we agree that the contract is ambiguous because its language regarding the due date of the additional earnest money is indefinite in expression. The Agreement specified that the initial earnest money was due two days after the execution of the Agreement, and another $100,000 in earnest money was due two days after the expiration of the due diligence period if the plaintiffs exercised the contractually provided one-time extension. However, with respect to the $1.35 million in additional earnest money due  at the expiration of the due diligence period, there was no definite time frame set forth in the Agreement as to when it is due other than stating it was due "upon" the satisfactory conclusion of the due diligence period. We agree with the trial court that the word "upon" is ambiguous. As noted by the trial court, dictionary definitions of upon include both "thereafter" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/upon (last visited Feb. 20, 2023)) as well as "on," "immediately," and "very soon after" (Dictionary.com, https://dictionary.com/browse/upon (last visited Feb. 20,

2023)).  As we agree that there is an ambiguity, we review the trial court's resolution of the ambiguity under the manifest weight standard.  *Chicago Investment Corp.*, 107 Ill. 2d at 124.

¶ 71    Here, the trial court's resolution was not against the manifest weight of the evidence.  Email communications between the parties indicated that the additional earnest money would be non-refundable at the expiration of the due diligence period.  In a December 10, 2018, email, Bakk wrote that the earnest money was non-refundable after the expiration of the due diligence period.  In an email on that same date, Faulkner wrote that the additional earnest money would be non-refundable "as of the last day" of the due diligence period.  If the earnest money was non-refundable at these times, that necessarily implied that it was required to be paid prior to the last day of the due diligence period or before that period ended.  The earlier drafts of the Agreement, specifying that it was due on the 60th day or the 90th day of the due diligence period, support this interpretation.  Both of those time frames were within the due diligence period, not a reasonable time after it ended.  The failure to include a specific day could reasonably be interpreted to mean that the additional earnest money could be paid at any time during the due diligence period but that it was not non-refundable until after the due diligence period expired.  Prior to that time, the plaintiffs could terminate the Agreement under the conditions of paragraph 2.5 and receive a full refund of the earnest money.

¶ 72    Moreover, we agree with the trial court's reasoning that, since the Agreement specified two-day windows for payment of the initial earnest money and the earnest money for the contractually provided 30-day extension, the parties' failure to include a specific due date after the expiration of the due diligence period for payment of the additional earnest money shows that it was to be paid during the due diligence period.  If it was to be paid within a certain time after the due diligence period expired, the parties could have written that explicit term into the Agreement.

The plaintiffs cite to an email dated October 5, 2018, from Faulkner to Bakk in which Faulkner wrote that the earnest money was to increase to $1.5 million "after the expiration of the Due Diligence Period." However, this conflicts with the above correspondence relating to when the earnest money became non-refundable. It is the trial court's responsibility to resolve conflicts in the evidence (*Williams v. Cahill*, 258 Ill. App. 3d 822, 825 (1994)) and even based on the October 2018 email, we cannot say the trial court's determination was against the manifest weight of the evidence.

¶ 73                                    2. Ready, Willing and Able

¶ 74    The plaintiffs next argue that they were entitled to specific performance because they were ready, willing, and able to pay the additional earnest money but were prevented from doing so by the defendants' silence and deception in not responding to the plaintiffs' request for an extension to the due diligence period. The plaintiffs also argue that the testimony at trial established that Castlerock was contractually obligated to provide the funds for the additional earnest money and that the additional earnest money and the funds needed for closing were available as of the end of January 2019.

¶ 75    In determining whether a party was ready, willing, and able to perform its obligations under a contract, this court has held:

> "A buyer is financially "able" if he is shown to have sufficient funds on hand or the ability to command the necessary funds within the required time. *** A purchaser is not shown to have financial ability if he is depending upon third persons who are in no way bound to furnish the funds. *** Nor is it sufficient if the purchaser merely contemplates a scheme or plan to raise the needed funds, if the plan is "wholly problematical." *Nelson v. Bolton*, 72 Ill. App. 3d 519, 525-26 (1979).

Generally, the standard of review applied regarding a judgment from a bench trial is whether the order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

¶ 76    In the present case, the evidence supports a determination that the plaintiffs were not ready, willing, and able to pay the additional earnest money. Barsh testified that there was nothing in writing obligating Castlerock, Daube, or Schnaper to pay the additional earnest money. Barsh also testified that he did not want to pay the additional earnest money when he learned that the plaintiffs were still finalizing the loan documents to include an amendment requested by the lenders. In that regard, Faulkner's emails requesting personal indemnity from KP and Raja indicated that finalizing the loan depended on the execution of the amendment. Bakk testified that when the Agreement was originally negotiated he informed Faulkner that the defendants would never agree to personal indemnity. Further, the amendment sought by the plaintiffs included an additional contingency, such that if the plaintiffs could not secure financing, they had until the date of closing to terminate the Agreement and receive a full refund of all the earnest money. The inference is that the plaintiffs were still unsure if they could secure financing. Accordingly, the evidence showed that, as of February 19, 2019, the plaintiffs were still requesting changes to the Agreement and the financing was dependent on the requested modifications. In the absence of a final amendment that satisfied the lenders, Barsh was not ready to pay the additional earnest money. Based on this evidence, we cannot say the trial court's determination, that the plaintiffs were not ready, willing, and able to execute the Agreement, was against the manifest weight of the evidence.

¶ 77    In so ruling, we note that the plaintiffs rely on Barsh's testimony that, as of January 31, 2019, Castlerock had the funds to pay the additional earnest money and intended to do so. However, this ignores Barsh's later testimony, that when the parties were not reaching agreement on the requested amendment, Barsh did not want to pay the additional earnest money because he feared he would lose it if the Agreement fell through. The plaintiffs also cite to the February 15, 2019, operating agreement of 5M Rock Holdings. However, while the operating agreement stated that the "equity member" was responsible for paying the additional earnest money, the equity member was not identified in that agreement. Further, the plaintiffs cite evidence of the "all hands on deck call" where the lenders and the plaintiffs agreed that they could move forward on the Agreement in the absence of an amendment. However, this call was five days after the additional earnest money was due and was, therefore, too late.

¶ 78    The plaintiffs next argue that the defendants' actions excused them from performing under the Agreement. Specifically, the plaintiffs contend that the defendants' failure to inform them that they would not agree to personal indemnity and would not extend the due diligence period left them in limbo which was why they did not pay the additional earnest money. This argument is unpersuasive. We agree with the trial court that the defendants made it very clear that KP and Raja would not agree to the request for personal indemnity. Bakk testified that he informed Faulkner during the initial contract negotiations that the defendants would not agree to personal indemnity and, at trial, he testified that he again refuted the requests for personal indemnity on January 31, February 4, and on February 14. Further, the absence of any response to a request for an extension, especially as the due diligence period was coming to an end, was essentially indicative that the defendants would not agree to an extension. At that point, the trial court's

finding that the plaintiffs needed to pay the additional earnest money to secure their right to move forward with the agreement was not against the manifest weight of the evidence.

¶ 79    Moreover, the contract was signed on October 5, 2018, and the contract was originally structured as an equity transaction. There was no evidence from the plaintiffs as to why they were proposing changes to the Agreement to accommodate the equity structure over three months later. In fact, in an email dated January 4, 2019, Barsh stated that he was unhappy with Faulkner because this was an equity deal, the term sheet with the lender did not support that, and it was unclear if the lender would even allow it. On January 9, Barsh sent an email indicating that the lender was opposed to closing in an equity structure. Clearly the last-minute need for contract amendments cannot be placed at the feet of the defendants.

¶ 80    The plaintiffs argue that they were misled because Bakk knew as of February 14 that the defendants would not agree to an extension of the due diligence period. However, Bakk did not specifically testify to this. He testified that, "in practical terms," as of February 14, 2019, the defendants would not agree to an extension because he did not know if the plaintiffs were going to agree to the proposed amendment as modified by the defendants. The implication was that if the plaintiffs had agreed to the defendants' modifications of the proposed amendment (to exclude personal indemnity), the defendants may have agreed to an extension.

¶ 81    In arguing that they were misled by the defendants' failure to respond to the extension request, the plaintiffs cite *Omni Partners v. Down*, 246 Ill. App. 3d 57 (1993). In *Omni*, the parties entered a written real estate contract that provided closing would take place by March 1, 1989. *Id.* at 58. On March 6, 1989, the seller forwarded a survey to the buyer and requested that they arrange for a closing on the property. *Id.* at 59. Thereafter, the buyer repeatedly requested that the parties set a closing date. *Id.* at 60, 64. The closing never occurred and the buyers filed a complaint for

specific performance of the contract. *Id.* at 58. The trial court granted the request for specific performance and this court affirmed. *Id.* We held that the seller waived the March 1 closing date when she, rather than sending a letter of default, sent a letter on March 6 requesting to set a closing date. *Id.* at 64. Based on the plaintiff's repeated requests thereafter to set a closing date, this court held that the trial court's determination that the buyer was ready, willing, and able to consummate the transaction was not against the manifest weight of the evidence. *Id.* This court held:

> "We believe that, in failing to demand strict performance on March 1 and in failing to give [buyer] a specific closing date while [buyer] was willing to close at all relevant times after the March 6 letter indicating waiver of the condition, [buyer] was prevented from performing and should be legally excused from doing so. [Seller's] overall conduct by silence, accommodation or acquiescence lulled [buyer] into a false sense of security, and therefore [buyer] could not be in material breach of the contract." *Id.* at 65.

¶ 82 The plaintiffs' reliance on *Omni* is unpersuasive. The defendants in the present case did not lull the plaintiffs into a false sense of security. The evidence showed that the plaintiffs were repeatedly informed that the defendants would not agree to KP and Raja providing personal indemnity. Further, previous requests for extensions were agreed to by the parties and timely granted. The evidence showed that Bakk wrote an email on January 31, 2019, granting an extension of the due diligence period from February 5th to the 19th. As February 19 approached, the failure to have a response or written extension should not have lulled the plaintiffs into a false sense of security. Rather, it should have been clear that an extension was not being granted. In *Omni*, the seller made affirmative representations that it still wanted to close on the contract. Here, unlike *Omni*, the defendants did not make any affirmative representations that they would agree to the amendment as written by the plaintiffs or that they would extend the due diligence period.

Accordingly, the evidence does not support a finding that the plaintiffs were lulled into a false sense of security.

¶ 83                3. Waiver of "Time is of the Essence" Provision of the Agreement

¶ 84    The plaintiffs next argue that the defendants waived the time is of the essence provision of the Agreement because they had waived the timing provisions more than once.  The plaintiffs note that the defendants allowed for a late deposit of the original earnest money and they also agreed to extend the due diligence period to February 19, 2019.  The plaintiffs assert that the defendants' silence as to the request for another extension was thus deceptive and that the defendants should not be allowed to enforce the provision.

¶ 85    "The extent to which a 'time is of the essence' provision in a contract will be strictly enforced depends upon the intention of the parties as determined primarily by the language used viewed under the circumstances surrounding the agreement as they reflect on the meaning of the words." *Hart v. Lyons*, 106 Ill. App. 3d 803, 805 (1982).  A "time is of the essence" clause can be waived if the parties' conduct is inconsistent with enforcement of the provision.  *Id.*  "The mere extension of [a deadline], absent some evidence of modification of the 'time is of the essence' provision, does not [generally] operate to waive that clause in a contract."  *Id.* at 806.  A trial court's determination on this issue will be reversed only if it is against the manifest weight of the evidence.  *Id.* at 805.

¶ 86    In the present case, the trial court's conclusion that the defendants did not waive the time is of the essence clause was not against the manifest weight of the evidence.  It is true that the original earnest money was paid two days late.  However, Bakk testified that this was because the escrow account had not been set up on time and that the two-day extension was by agreement of the parties.  Further, when the plaintiffs exercised their right to a one-time extension of the due

diligence period, the contractually required payment of $100,000 of earnest money was timely paid. Finally, when the parties agreed to another extension of the due diligence period, to February 19, 2019, the parties agreed to that extension on January 31 and Bakk sent an email to Faulkner specifically granting the requested extension. All the extensions were thus contractually provided or by agreement of the parties. As noted by the trial court, it is also significant that the previous extensions were agreed to prior to end of the due diligence period. The defendants did not let the due diligence period lapse and then grant extensions. Accordingly, nothing in the defendants' conduct amounted to an express or implied waiver of the deadline on the due diligence period or the time is of the essence clause.

¶ 87                    B. Breach of the Covenant of Good Faith and Fair Dealing

¶ 88    The plaintiffs next argue that, even if not entitled to specific performance, they are entitled to damages for the defendants' breach of the covenant of good faith and fair dealing. As a related matter, the plaintiffs argue that the trial court erred in finding that the exculpatory clause in the Agreement limiting damages to specific performance (paragraph 8.2), precluded monetary damages for the defendants alleged breach. The plaintiffs assert that exculpatory clauses are not enforceable when one of the parties has acted in bad faith. Accordingly, the plaintiffs assert that if we hold that the trial court erred in finding no bad faith, that we should also hold that the Agreement does not preclude monetary damages.

¶ 89    A covenant of good faith and fair dealing is implicit in every contract as a matter of law. *The Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 42. The obligation of good faith and fair dealing "is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions." *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112 (1993). "Disputes involving the

exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract." *Id.* Under this doctrine, a party with contractual discretion must exercise the discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner that is inconsistent with the parties' reasonable expectations. *Id.*

¶ 90 The meaning of "good faith" can vary depending on the context. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 474 (2004) (citing Restatement (Second) of Contracts § 205, comment a, at 100 (1981)). Good faith is acting in a way that is consistent with the justified expectations of the other party. Bad faith can be characterized as conduct that " 'violate[s] community standards of decency, fairness or reasonableness.' " *Id.* A trial court's factual finding as to whether a party performed in good faith on a contract will not be reversed unless it is against the manifest weight of the evidence. See *Midwest Television, Inc. v. Oloffson*, 298 Ill. App. 3d 548, 558 (1998) (applying manifest-weight standard to trial court's determination of good-faith performance on a contract).

¶ 91 In the present case, the plaintiffs argue that the defendants acted in bad faith in refusing to agree to an indemnity provision and in refusing to respond to the request for an extension of the due diligence period. The plaintiffs assert that by failing to respond to the extension request, the defendants led them on and prevented them from making an informed decision as to how to proceed with the contract. The plaintiffs assert that the defendants had the discretion to extend the due diligence period and to agree to personal indemnity but the defendants exercised such discretion in bad faith.

¶ 92 At the outset, we note that the plaintiffs have failed to cite any part of the Agreement that is ambiguous or unclear with respect to the issues of indemnity or extensions to the due diligence period. Absent such ambiguity, the implied covenant is inapplicable. *Resolution Trust Corp.,* 248

Ill. App. 3d at 112; see also *Seip v. Rogers Raw Materials Fund, L.P.,* 408 Ill. App. 3d 434, 444 (2011) (duty of good faith and fair dealing is not an independent source of duties to a contract's parties but is rather used as a construction aid in determining the parties' intent where an instrument is susceptible to two conflicting constructions). Moreover, the discretion to amend the Agreement to include personal indemnity or grant an extension to the due diligence period is generally not the type of discretion that gives rise to the implied covenant of good faith and fair dealing. *Id.*

¶ 93    Nonetheless, even if the implied covenant could be applied, we cannot say that the trial court's determination was against the manifest weight of the evidence. The record belies the plaintiff's assertion that the defendants led them on in order to run out the clock on the due diligence period. Bakk testified that, during the original contract negotiations, he informed the plaintiffs that the defendants would never agree to a personal indemnity provision. When Faulkner sent them the proposed amendment, which included personal indemnity, such provisions were struck out by Bakk and Russ. Faulkner sent another revision that continued to include the personal indemnity provision. As of February 15, Faulkner was on notice that the personal indemnity provision was again being stricken. Instead of accepting this fact, Faulkner sent another revised amendment on February 18 that added the personal indemnity language back into the Agreement's proposed amendment. The evidence demonstrates that the defendants made it clear on numerous occasions that personal indemnity was not acceptable to them.

¶ 94    Moreover, the record supports the trial court's determination that the last-minute request for an amendment to include personal indemnity was due to the plaintiffs' delay in notifying their lenders. A January 4, 2019, email written by Barsh indicated that the plaintiffs had failed to inform the lenders of the equity structure of the Agreement. When the lenders expressed disapproval, the plaintiffs needed to renegotiate the contract terms. Thus, the evidence supports a conclusion that

the defendants did not lead the plaintiffs on. Rather, the plaintiffs were trying to force an issue that was clearly not acceptable to the defendants. As noted by the trial court, the plaintiffs could have had an "all hands on deck call" prior to the expiration of the due diligence period and accepted the amended contract without personal indemnity.

¶ 95     The plaintiffs also argue that the defendants acted in bad faith when, on the last day of due diligence period, Bakk directed Faulkner to contact Russ to discuss the extension. When Faulkner reached out to Russ, Russ never responded. While this is true, we still cannot say that the trial court's determination that this did not constitute bad faith was against the manifest weight of the evidence. The trial court found, and the evidence supported, that the plaintiffs were unable to secure financing with their lenders and were thus trying to renegotiate the contract at the last minute. The plaintiffs could have accepted the defendants' final version of the amendment, paid the additional earnest money, and secured the right to move forward with the deal. Bakk essentially testified that, had the plaintiffs agreed to the amendment, it was possible the defendants would have granted an extension. But in the absence of an agreement, there was no point in granting an extension. It is well settled that the trier of fact is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23. The trial court specifically found Bakk's testimony credible and we decline to disturb its determination. The evidence supports the trial court's determination that the defendants exercised discretion not to extend the due diligence period reasonably and with proper motive. As we affirm the trial court's finding that the defendants did not breach the covenant of good faith and fair dealing, we need not address the plaintiffs' contention that the Agreement did not preclude monetary damages.

¶ 96                              C. Liquidated Damages

¶ 97    The plaintiffs' final contention on appeal is that the trial court erred in finding that Reiter violated the confidentiality provision of the Agreement and awarding the defendants $25,000 in liquidated damages.  The plaintiffs argue that the confidentiality provision in the Agreement only allowed for liquidated damages when the violation was by a broker.  The plaintiffs assert that Reiter was acting in his role as buyer and that the only remedy under the Agreement was injunctive relief.  Alternatively, the plaintiffs argue that, because the Agreement provided that liquidated damages would be split evenly between the buyer and the seller, the defendants were only entitled to $12,500 in liquidated damages.

¶ 98    The defendants argue that Reiter wore two hats in this transaction.  He was identified as the principal of 5M Rock Holdings, which was identified as the "Broker" in the agreement.  He was also the principal of George Street.  The defendants argue that the evidence showed that Reiter did not always obtain non-disclosure agreements before providing confidential information and that it did not matter who he was acting on behalf of.  The defendants also argue that Reiter's wrongdoing does not entitle him to half of the liquidated damages and that the trial court's ruling should be affirmed.

¶ 99    The resolution of this issue requires us to interpret section 2.2 of the Agreement.  The interpretation of any contract is a question of law and is subject to *de novo* review.  *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007).  As stated above, the primary goal of contract interpretation is to give effect to the intent of the parties.  *Thompson*, 241 Ill. 2d at 441.  In determining the intent of the parties, a court must consider the document as a whole and not focus on isolated portions of the document.  *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 164 (2002).  If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from

the language of the contract itself, which should be given its plain and ordinary meaning, and the contract should be enforced as written. *Thompson*, 241 Ill. 2d at 441.

¶ 100 In the present case, there was substantial evidence that Reiter sent out confidential information without first obtaining non-disclosure agreements. Barsh testified that he received confidential information related to the properties being sold and that, after the Agreement fell through, Reiter attempted to have him back date a non-disclosure agreement. Further, the record shows that when Reiter sent the confidential information to Barsh via email, Reiter also stated in the email that he had sent the information to "+100" groups and that Barsh had the green light to send it to any others that might be interested. At trial, Reiter did not deny sending out confidential information to potential lenders, he testified only that, when he did so, it was in his role as buyer, not as broker.

¶ 101 The plain language of section 2.2 of the Agreement states that, in the event of a breach of the confidentiality provision, buyer and seller agree that "there may be no adequate remedy at law" and that either party shall have the right to seek injunctive relief. We disagree with the plaintiffs' assertion that this language limits damages for the buyer or seller to injunctive relief. Rather, this language merely provides that injunctive relief is an available option if there is no adequate remedy at law. Section 2.2 of the Agreement also stated that if a broker violated the confidentiality provision, the buyers and sellers were entitled to $25,000 as liquidated damages, to be divided evenly between them. This language shows that the parties contemplated that a reasonable award of damages for breach of the confidentiality provision was liquidated damages of $25,000. A liquidated damages provision provides parties with a reasonable predetermined damages amount where actual damages may be difficult to ascertain. *Hickox v. Bell*, 195 Ill. App. 3d 976, 987-88 (1990).

¶ 102   In the present case, the plaintiffs do not argue that $25,000 was not a reasonable amount of damages.  They argue only that because Reiter acted in his role as buyer, the damages were limited to injunctive relief.  We hold that Reiter clearly violated the confidentiality provision of the Agreement, that the provision did not limit recovery to only injunctive relief, and that the parties, when making the contract, contemplated that $25,000 was a reasonable amount of damages.  Here the trial court awarded that amount based on Reiter's breach.  While the plaintiffs argue that the Agreement required the liquidated damages to be split between the parties, it is well settled that "[a] party who materially breaches a contract cannot take advantage of the terms of the contract that benefit him." *MHM Services Inc. v. Assurance Company of America*, 2012 IL App (1st) 112171, ¶ 48 (citing *James v. Lifeline Mobile Medics*, 341 Ill. App. 3d 451, 455 (2003)).  Accordingly, we affirm the trial court's damages award.

¶ 103                                III. CONCLUSION

¶ 104   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 105   Affirmed.