OMNI PARTNERS, Plaintiff-Appellee, v. KATHLEEN M. DOWN, Defendant-Appellant.

Second District   No. 2—92—0505

Opinion filed June 9, 1993.

Theodore L. Kuzniar and Julie A. Coleman, both of Bochte & Kuzniar, of St. Charles, for appellant.

Douglas Drenk and Jeffrey D. Baxendale, both of Douglas Drenk & Associates, P.C., of Wheaton, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant and seller, Kathleen M. Down, appeals from an order of the circuit court dated September 24, 1991, and entered September 25. That order granted specific performance to plaintiff, Omni Partners (Omni), which had contracted with defendant to buy certain real estate in Algonquin, Illinois. Defendant perfected this appeal following the court's award of attorney fees to plaintiff in the amount of $12,600 on March 30, 1992, pursuant to the remedies provided for in the real estate sales contract.

On appeal, defendant argues that plaintiff was not ready, willing and able to perform the terms of the real estate contract and that the court's order of specific performance was against the manifest weight of the evidence. We affirm.

On May 9, 1989, plaintiff filed a complaint for equitable relief to compel specific performance of the written real estate contract entered into between the parties for the sale of approximately 10 acres on Sleepy Hollow Road in Algonquin. The contract was dated June 10, 1988. The stated sale price of the property was $12,770 per gross acre. George Samatas signed on behalf of plaintiff. The contract provided that the closing would take place on or before March 1, 1989. This suit arose from the failure to close on that date.

At trial, the seller (defendant) testified as plaintiff's adverse witness. She signed the contract on June 10, 1988. In July or August 1988, she contacted attorney Calvin Koeppel, who later became involved in correspondence with the buyer (plaintiff) concerning the real estate transaction. Defendant invoked the attorney-client privilege concerning certain communications with Koeppel.

Defendant testified concerning a letter dated March 6, 1989, from Koeppel to James Samatas, a licensed attorney and son of George Samatas; James was involved with his father George in the real estate transaction. Defendant stated that she had directed Koeppel to ask for a closing "immediately." Regarding the purchase of the 10 acres,

the Koeppel letter stated: "Enclosed herewith is a copy of the survey on the above-referenced property. Kindly review and contact me so that we can arrange for the closing of the above-referenced property." Defendant testified that she received a copy of the letter.

Defendant also testified that she had seen a copy of a letter from Koeppel dated May 16, 1989, and sent to Byron Faermark concerning the property. The letter stated in pertinent part:

"As you know, your client, James Samatas, contacted me with reference to getting a letter from me as to what it will require for my client to sell her property and to close immediately. In accordance with his request, it is my client's desire to get $164,625.00 after paying real estate commissions for the sale of her property. This is the amount that is necessary for her to complete her trade."

Defendant did not have conversations with George and James Samatas, but contacted them through her attorney. Although she had discussed a closing with her attorney, defendant acknowledged that she did not appear on March 1 at any office for a closing on that date. She did not receive any closing documents from her attorney prior to March 1 other than letters.

James Samatas testified that he was a licensed attorney and was employed by and was a general partner of Omni, a real estate investment and development firm. George Samatas, who signed the contract, was a general partner of Omni. James had been contacted by Koeppel prior to the closing date regarding certain other contingencies that are not the subject of this appeal. He recalled having a conversation in September with Koeppel regarding the waiver of the contingency to purchase the neighboring "Vehe" property as part of the transaction. In addition, there was some discussion concerning whether the March 1, 1989, closing date was reasonable and regarding Koeppel's client's desire to find a property suitable for a like-kind exchange for tax-saving purposes.

On February 17, 1989, James received a title commitment from the Chicago Title Insurance Company for the 10-acre parcel. James took particular notice of an exception in the commitment referring to an easement (exception No. 4) and certain covenants and restrictions contained in the trustee's deed (exception No. 5). Several days later, James spoke to Koeppel on the telephone regarding these exceptions. James was concerned because he did not know where the easement was. On February 27, 1989, Koeppel faxed a copy of the survey, which did not show the location of the easement. James had a conversation by telephone with Koeppel in which he requested that a current

survey be prepared because the one he had received was undated, and James considered the location of the easement critical. According to James, Koeppel stated he would forward a new survey and then they would discuss setting a specific closing date. In February, James also received a copy of the trustee's deed, which included certain covenants and restrictions, and a copy of the right-of-way easement executed February 6, 1942.

Prior to March 1, James did not obtain a closing statement or a notice of a time and place for the closing. James testified that he received a copy of the March 6 letter from Koeppel. He also received another faxed copy of a survey on March 6. With the March 6 letter, James also received a (new) plat of survey showing the location of the easement. After receiving the new survey, James spoke to Koeppel on the telephone on March 8 or 9; James indicated that he wanted to set a specific closing date. James recalled from that conversation that Koeppel's client was still concerned about finding another parcel for an exchange, and Koeppel expressed a willingness to extend the time for closing.

Early in April, James had a telephone conversation with Koeppel to establish a final closing date. Koeppel stated that he could not give James a closing date because his client was now requesting additional funds over the original purchase price of the contract. The price was approximately $164,000 in addition to the realtor's commission. James requested that Koeppel put this request in writing and demanded that defendant set a closing date pursuant to the original contract. Koeppel then issued the May 16, 1989, letter in which the defendant asked for the new price of $164,625 exclusive of the realtor's commission; the original price had been $127,700. James further testified that during the period in question Omni was in good financial condition and had bank deposits in excess of $400,000 so that there were assets sufficient to close the deal.

On cross-examination, James testified that the reason for the original closing date was to provide sufficient time for his father to consummate the purchase of the adjacent Vehe property for development. Although plaintiff became aware in August 1988 that the Vehe property transaction could not be completed because someone else purchased the property, Omni decided nevertheless to purchase defendant's property and waived the contingency. Despite his concern about the effect of the easement, James admitted that a private easement was not a title defect, but he maintained that it was an unpermitted exception to the contract. James was aware of the right-of-way easement in February 1989. He conceded that it was a permitted excep-

tion under the title commitment and that he eventually advised his father that there was no title defect. James testified that he was willing to close on March 1 despite his concern regarding the easement but that closing did not take place because it had been previously agreed that the closing would be postponed.

Defendant called George Samatas as an adverse witness. George testified that he had been in the real estate management business for 30 years and that James handled some of Omni's legal affairs. When George signed the real estate contract, he was also interested in acquiring the Vehe property, which consisted of some 300 acres. George had offered $13,000 per acre. The contract with defendant was initially contingent on the purchase of the Vehe property before March 1, 1989. The contingency was later waived. George traveled to Florida in December 1988. He initially testified that he was unsure when he returned from Florida, but then admitted he returned on March 28, 1989. George admitted by way of impeachment that a developer had offered him $164,000 after he had signed the contract.

Defendant testified that, on March 1, 1989, she had located a trade parcel. She did not request an extension of time for the closing. She directed Koeppel to send the March 6 letter and she had received a copy of it. On cross-examination, she stated she did not go to any office to close; she did not execute a deed or review a closing statement.

Attorney Calvin Koeppel testified that he ordered the title report on February 7, 1989. On that date, he had a telephone conversation with James, who requested that a new survey be prepared. On February 17, James called and left a message for Koeppel, who was not in his office. On February 27, James called again and inquired about an easement on the property and asked that it be recorded on the survey. James said he could not close on March 1 and that his father was not in town. No date was set for the closing. The new survey was delivered to Koeppel's office on March 3.

On March 6, 1989, Koeppel called James and told him that the survey was completed the way he wanted it and was ready to close. James did not know when his father was returning. Koeppel stated that his client had an exchange property. James said he would get back to Koeppel. On April 13, there was another telephone conversation in which James said his father was coming back and they wanted to set a date for closing. At this time, Koeppel told him that his client "considered them in default of the contract" and Koeppel could not set a date for closing. About a week later, Koeppel got a call from Byron Faermark, who Koeppel believed was the attorney of George

Samatas. Koeppel did not testify regarding the substance of that conversation. Koeppel also received a call from James Samatas on May 14, 15 or 16 in which James asked him what it would take to resurrect the deal; his father was in town and he wanted to close. According to Koeppel, the letter of May 16 setting a new price was in response to this conversation. Koeppel asserted that he never asked for a continuance of the March 1 closing date.

On cross-examination, Koeppel stated that he did not remember preparing a deed or a closing statement for the March 1 closing. While he admitted that he did not receive the survey until March 3, it was available to be picked up from the engineering firm on February 28. Koeppel claimed that he had informed plaintiff that the closing would take place in his office on March 1. Although he considered plaintiff in default on March 1, he acknowledged that he did not send plaintiff a letter of default. On redirect examination, he stated that he had not set a new date.

In rebuttal, James Samatas stated he disagreed with any inference or specific statements made by Koeppel concerning James' unwillingness to close or Koeppel's offer to close or a demand to close on the specific date of March 1.

In response to the court's examination, James stated he did not recall a conversation with Koeppel on May 16 regarding "resurrecting the deal." James did recall an April conversation concerning the deal after his father had spoken with Faermark to close the transaction. According to James, it was Faermark who was communicating with Koeppel at that time.

After hearing the arguments of counsel, the trial court granted plaintiff's prayer for an order of specific performance according to the terms of the original contract.

■ We now consider whether the court correctly granted specific performance. Specific performance may be granted where there is a valid and enforceable contract, and questions of contractual validity or interpretation are matters of law for the court to decide. (*Perkins v. Garcia* (1990), 194 Ill. App. 3d 590, 593.) Specific performance is an equitable remedy and is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case. (*Djomlija v. Urban* (1982), 107 Ill. App. 3d 960, 967.) A court's decision to grant such relief will not be disturbed absent an abuse of discretion, and the decision to grant it must be supported by evidence which is clear and convincing. *Tantillo v. Janus* (1980), 87 Ill. App. 3d 231, 239.

■ The main thrust of defendant's contention is that plaintiff was not ready, willing and able to perform. Generally, a party will be entitled to specific performance of a contract for the conveyance of real estate only upon establishing either that the party has performed according to the terms of the contract or that the party was ready, willing and able to perform but was prevented, and thus excused, from doing so by the acts or conduct of the other party. (*Tantillo*, 87 Ill. App. 3d at 234.) First, defendant argues that, because the contract contained a provision that time was of the essence and plaintiff failed to close on March 1, plaintiff's failure to close was a material breach of the contract, and defendant as the injured party had the choice of continuing the contract or refusing to go on. (See *South Beloit Electric Co. v. Lar Gar Enterprises, Inc.* (1967), 80 Ill. App. 2d 367, 374.) We note that the remainder of the rule left unstated by defendant is that, if the injured party chooses to continue performance, he has doubtless lost his right to stop performance. *South Beloit*, 80 Ill. App. 2d at 374.

■ Second, although defendant asserts that there was insufficient evidence to show that the time for closing was extended, defendant also argues alternatively that, even if the time for closing was orally extended, plaintiff was not ready, willing and able to close within a reasonable period of time. In *Djomlija* (107 Ill. App. 3d at 966), the court states the rule that, where a contract does not set a closing date and time is not made of the essence, the law will imply that the contract is to be performed within a reasonable time.

It is uncontested that until March 1 there was a valid and enforceable agreement in existence between the parties. Thus, this court must determine whether (1) there was a waiver of the time requirement or other circumstances excusing the performance of plaintiff and overcoming the claimed breach of contract and (2) whether plaintiff was ready, willing and able to perform within a reasonable period of time.

■ Defendant does not dispute that the parties to a contract may waive delays in performance by words or conduct which indicates an intention to regard the contract as still in force and effect even where the terms are in writing or where time is of the essence. (*Barnes v. Brown* (1990), 193 Ill. App. 3d 604, 610; *Kitsos v. Terry's Chrysler-Plymouth, Inc.* (1979), 70 Ill. App. 3d 728, 731.) We are persuaded that this is what occurred in the case at bar.

It is clear from Koeppel's March 6 letter to plaintiff, the faxed documents, and the telephone conversations on or prior to March 1 that the closing date was extended and the time-is-of-the-essence pro-

vision was waived. We therefore need to examine the ensuing conduct and determine what was the legal relationship between the parties after that date. Although the testimony is somewhat contradictory as to what occurred, plaintiff's testimony was consistent in showing that it wished to perform at all times following the waiver of performance early in March. After he received the new survey, James called Koeppel on March 8 or 9 and asked to set a specific closing date. According to James, Koeppel was willing to extend the time for closing. James had another conversation early in April in which he sought to establish a closing date. At this time, Koeppel stated he could not give a closing date because his client was now requesting additional funds to consummate the transaction. Although James asked that this proposal be put in writing, he again requested that a closing be set pursuant to the original contract.

Koeppel's testimony was consistent with that of James in stating that on April 13 he received a call from James in which James said his father was coming back and wanted to set a date for closing. However, it was at this time that Koeppel told him that his client considered plaintiff in default and would not set a date. In mid-May, plaintiff again requested a closing. According to Koeppel, at this time James asked what it would take to resurrect the deal. However, James denied that he had said this. Koeppel admitted that no letter of default was ever sent to plaintiff. Apparently as a result of further communications with Faermark, Koeppel wrote a letter dated May 16 in behalf of his client, who was now asking for $164,000 to close the deal. The evidence also showed that no final closing documents were ever prepared. This tends to negate any claim of eagerness on the part of defendant to close.

Plaintiff's testimony, which the court chose to believe, shows that it was ready at all relevant times to consummate the transaction. It was for the trial court to assess the credibility of the witnesses. (*Zaderaka v. Illinois Human Rights Comm'n* (1989), 131 Ill. 2d 172, 180.) There does not appear in the record any good-faith effort on the part of defendant to give plaintiff a closing date after repeated requests. Without giving plaintiff a clear, timely and unequivocal notice of default and an opportunity to cure it by setting a closing date, defendant arbitrarily chose instead to consider plaintiff in default, then unilaterally changed the terms of the transaction by demanding a large increase in the price of the property.

■■ We believe that, in failing to demand strict performance on March 1 and in failing to give plaintiff a specific closing date while plaintiff was willing to close at all relevant times following the March

6 letter indicating waiver of the condition, plaintiff was prevented from performing and should be legally excused from doing so. Defendant's overall conduct by silence, accommodation or acquiescence lulled plaintiff into a false sense of security, and therefore plaintiff could not be in material breach of the contract. See *Tantillo*, 87 Ill. App. 3d at 237 (acceptance of delays coupled with absence of demand to perform resulted in waiver, and there was no material breach of contract); *Kitsos*, 70 Ill. App. 3d at 732 (where specified date of performance is waived, date is extended to a reasonable time which becomes a question for the trier of fact); see also *Aden v. Alwardt* (1979), 76 Ill. App. 3d 54, 60 (where seller did not revive her right to strict compliance with the time-of-the-essence clause or warn buyer, specific performance was proper where seller received the benefit of her bargain; equity would consider time of performance merely a formal defect).

Even if plaintiff could be said to have committed a minor breach by delaying performance, we would consider it a nonmaterial breach of the agreement which would not preclude specific performance. (See *Regan v. Garfield Ridge Trust & Savings Bank* (1991), 220 Ill. App. 3d 1078, 1086.) A court may relieve a defaulting purchaser and order specific performance if it would be unreasonable not to do so under the circumstances. See *Regan*, 220 Ill. App. 3d at 1086.

Because defendant waived the requirement that time was of the essence and failed or refused to give plaintiff a new closing date, plaintiff could not materially breach the contract so long as it was willing to perform and demonstrated its willingness to comply honestly with the contract within a reasonable period of time. From the second week of March, plaintiff attempted to get a new closing date over a period of a few weeks. In such a case, the law will provide a reasonable time for performance. The inescapable inference we draw from the evidence is that, despite her acquiescence in delaying the closing, defendant actually attempted to repudiate her contract only when she became convinced that she could get a higher price than she had agreed upon, and she now seeks to avoid performance on flimsy technicalities which find no support in law or in equity. See, *e.g.*, *Laegeler v. Bartlett* (1957), 10 Ill. 2d 478, 486-87.

We conclude that defendant waived the time of performance and that plaintiff did not materially breach the contract and was ready, willing, and able to perform the contract within a reasonable period of time.

In considering all of the circumstances shown in the evidentiary record, we also conclude that it would have been inequitable to deny plaintiff the benefit of its contract. Having condoned delays of short

duration, defendant should not be allowed to take advantage of those delays to plaintiff's detriment. (See *Kingsley v. Roeder* (1954), 2 Ill. 2d 131, 142.) The evidence was clear and convincing and supports the trial court's decision to grant specific performance. An opposite conclusion is not clearly evident.

The judgment of the circuit court is affirmed.

Affirmed.

INGLIS, P.J., and UNVERZAGT, J., concur.