2025 IL App (1st) 210341-U

Nos. 1-21-0341 & 1-21-0396 (cons.)

First Division
May 12, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| FITZ 223, LLC, an Illinois limited liability company, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee/Cross-Appellant/Separate Appellant, | ) ) ) | |
| v. | ) ) | Nos. 16 CH 01246 & 16 MI707333 cons. |
| 225 W. ONTARIO CORP., an Illinois corporation, | ) ) ) ) | Honorable Sophia H. Hall, Judge, Presiding. |
| Defendant-Appellant/Cross-Appellee, | ) ) | |
| and | ) ) | |
| DAVID LYNN and RENEE LYNN, | ) ) | |
| Defendants/Separate Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's judgment is affirmed where a lessee properly exercised its option to purchase real property from a lessor, but was not entitled to specific performance because lessee did not prove it was ready, willing, and able to pay the option price.

¶ 2    These consolidated appeals arise from a lease of real property between lessee 225 W. Ontario Corp. (Ontario) and lessor Fitz 223, LLC (Fitz). The parties' lease contained an option provision that allowed Ontario to purchase the property for $4.5 million if the option was exercised in 2015. Ontario purported to exercise that option in November 2015, but the transaction never closed. Fitz filed suit in the trial court seeking, among other things, a declaratory judgment that Ontario did not properly exercise its option. Ontario filed a counterclaim seeking an order for specific performance directing Fitz to convey the property according to the terms of the option. Following a bench trial, the trial court found that Ontario properly exercised its option, but denied specific performance on the grounds that Ontario had failed to prove its ability to pay the option price. The parties filed cross-appeals, with Fitz arguing that Ontario did not properly exercise its option and Ontario arguing that the trial court should have granted it specific performance. For the following reasons, we affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4    Fitz is a member-managed limited liability company and owner of the real property located at 219-233 West Ontario Street in Chicago (the Property). Michael Faucher is the managing member of Fitz. Ontario is an Illinois corporation for which David Lynn serves a president. David Lynn's mother, Renee Lynn, is a shareholder in Ontario.

¶ 5                          A. The Lease and Option Provision

¶ 6    Ontario began renting the Property in May 2011. The lease contained a guaranty signed by David Lynn. The lease also contained an option for Ontario to purchase the Property that stated:

"Tenant [Ontario] shall have an option to purchase the premises and terminate this lease by giving 45 days written notice of the intent to purchase. The purchase price shall be until December 31, 2013 FIVE MILLION DOLLARS after December 31, 2013 the purchase price shall be FIVE MILLION FIVE HUNDRED THOUSAND DOLLARS. After December 31, 2014 until December 31, 2015 the purchase price shall be SIX MILLION DOLLARS. The date notice is given shall set the price. All transaction[s] must close within 90 days of giving notice and price shall be the price at the time of giving notice. The unpaid rent at the time of purchase shall be discounted by a minimum of 25%."

¶ 7    In June 2012, the parties agreed to amend the lease in several ways. David Lynn again signed the amendment as a guarantor. As relevant here, the option provision was amended to provide:

"The tenant shall have the option to purchase the real property and all personal property thereon for the price of $4,175,000.00 (Four Million one hundred seventy five thousand dollars) until December 31, 2013. The option price for the year 2014 shall be $4,350,000 (Four million three hundred twenty five [*sic*] thousand). The option price for the year 2015 shall be $4,500,000 (four million five hundred thousand). After the fourth year the tenant shall have a right of first refusal."

The amendment also stated that the parties settled Ontario's arrearage of $495,631 for $175,000, which was to be paid in monthly installments of $3500. The evidence showed that Ontario did not make any payments towards the reduced arrearage.

¶ 8                              B. Ontario's Attempt to Exercise the Option

¶ 9    On October 12, 2015, David Lynn phoned Faucher and expressed interest in exercising the option by stating, "Mike, I have the money. I want to buy the building." Later that day, David

Lynn met with Faucher and paid $35,000 for rent, $7500 for taxes, and $17,000 for "an old tax bill." David Lynn again expressed interest in purchasing the Property at the meeting, stating, "Mike, I want to exercise my option, I'm ready to go now[.]" Faucher replied that Ontario should contact Fitz's attorney, Ira Kaufman.

¶ 10    On November 5, 2015, Kaufman sent an email to Ontario's attorney Jeffrey Strange demanding that Ontario pay certain arrearages and obtain a new insurance policy before any sale could proceed. Kaufman also forwarded Strange a message from Faucher identifying the arrearages and insisting that Fitz "will have no further discussions with [Ontario] about the purchase of the building UNTIL we have the above [arrearages] taken care of." Strange objected, contending that Fitz was attempting to impose conditions that were not in the option provision.

¶ 11    On November 10, 2015, Strange emailed Kaufman and again asserted that Ontario was not required to pay any arrearages in order to exercise its option. Nevertheless, Strange stated that Ontario intended to close before December 15, 2015 and would "pay all amounts owed at that time." As such, Strange requested that Fitz "provide a payoff letter or closing statement along with a title commitment."

¶ 12    On November 12, 2015, Ontario entered into an "Agreement for Lease and Ownership" of the Property with MRR Property Acquisition, LLC (MRR) with Ontario identified as "Tenant" and MRR identified as "Buyer" (The MRR Agreement). The agreement recites that Ontario is the current tenant with a right to purchase the Property for $4.5 million, and that the Ontario and MRR "desire to memorialize their understanding pursuant to which [MRR] will be granted the opportunity to purchase the [Property]." Under the agreement, Ontario was to inform Fitz that its right to purchase the Property "will be effected through a purchase contract in the name of [MRR]." Thereafter, MRR would negotiate the terms of the contract with Fitz. Attached as an exhibit to the

MRR Agreement was the proposed purchase contract that Ontario would deliver to Fitz. The proposed contract listed MRR as the "buyer."

¶ 13     The MRR Agreement further provided that MRR would pay Ontario $1.5 million "as consideration for the transfer of the purchase rights" and that Ontario could elect an additional cash payment of up to $200,000. Finally, the agreement provided that, after closing, MRR would become the lessor of a "New Lease" with Ontario through a newly-created limited liability company. Other companies owned by the Lynns would be members of the new landlord and receive a 30% membership interest therein with Ontario receiving the option to purchase an additional 20% interest for $1.5 million.

¶ 14     On November 18, 2015, Strange emailed the following letter to Kaufman:

"Dear Mr. Kaufman:

I represent 225 West Ontario, Inc. and David Lynn. You represent the owner of 225 W. Ontario in Chicago, Illinois.

Pursuant to Paragraph two of the lease amendment dated June 11, 2012, my client hereby formally exercises the right to purchase the property for $4,500,000. Please provide a payoff letter and title policy.

I have previously sent you emails exercising the option. Further David Lynn has notified Mike Faucher as representative of the owner of the intention to exercise the option. I am providing a formal letter so that there is no question that the option is being exercised. My previous emails were received but a payoff letter has not been provided. A proposed contract is attached as you requested. The exercise of the option is unconditional."

Also attached to the email was a proposed contract that was substantially similar to the proposed contract attached as an exhibit to the MRR Agreement.

¶ 15                          C. The Parties' Negotiations

¶ 16    Faucher testified that, upon learning of the November 18 letter, he instructed Kaufman to "due his due diligence" and "begin negotiations." Fitz then began negotiating directly with MRR, largely with Strange being copied on email communications. According to Faucher, this negotiation did not have "any relation" to Ontario's attempt to exercise its option. Over the next month, there was "[t]remendous back and forth between the lawyers," with "numerous revisions" to proposed contracts. Faucher explained that the primary subject of the negotiations was who would pay for certain environmental remediation, which was estimated to cost around $104,000.

¶ 17    On December 15, 2015, Strange emailed Kaufman complaining that Fitz had not closed the purchase despite Ontario's "formal option exercise" on November 18. Strange acknowledged that Fitz had suggested it might seek to extend the closing date, which Strange demanded be done in writing. Strange asserted that Ontario was "ready to close now" and would "take action to protect [its] rights" if a closing date or extension was not set by December 17, 2015.

¶ 18    The next day, December 16, 2015, Kaufman forwarded Strange the latest "proposed revised contract" between Fitz and MRR. The proposal contained a "Joinder" provision stating that the transaction was contingent on Ontario "acknowledging that it consents to the sale and waives the provisions of the purchase option under the Lease." However, a closing date was not set.

¶ 19    On December 21, 2015, Strange sent another email to Kaufman stating that Ontario "will close according to the terms of the option," meaning that it would "set a closing date before the end of the year" if Fitz did not formally request an extension. That same day, Kaufman responded

that Faucher was "under tremendous pressure from the family[1] and is talking about walking away from the deal[.]" According to Kaufman, "the problem is the environmental" and the rent owed by Ontario. Kaufman stated that Ontario needed to "pay the rent asap" to help the transaction move forward.

¶ 20    Later on December 21, 2015, Kaufman emailed a letter to Strange and an attorney for MRR stating that the November 18 "letter from attorney Jeffrey Strange exercising the option to purchase the property *** has been correctly exercised." Kaufman further stated that the parties would finalize the contract that week and were "in agreement to close the transaction in January 2016." Finally, Kaufman insisted that "one of the requirements in the contract" would be for Ontario and MRR to "indemnify the Faucher Family and Fitz 223 LLC from any further environmental" and "record the indemnification against any further Purchasers or assignors of the property."

¶ 21    At trial, both Faucher and Kaufman acknowledged that Faucher authorized Kaufman to admit that Ontario had correctly exercised its option. Faucher explained that he authorized the December 21 letter because he "thought [the exercise] was fine" and "[d]one properly." However, Faucher also testified that he was not aware of the MRR Agreement at the time he authorized the email and "absolutely would not have allowed" Kaufman to send the letter had he known about the dealings between Ontario and MRR. Faucher further acknowledged that Ontario's November 18 email included a proposed contract identifying MRR as the buyer, but testified that he did not inquire into who MRR was and instead "left it in [his] lawyer's hands." Kaufman testified that he was aware that Ontario and MRR were "doing some type of joint venture together" at the time he

---

[1] The record shows that many, if not all, of the members of Fitz are in some way related to Faucher.

sent the December 21 letter. However, Fitz maintains that it did not learn of the MRR Agreement until pretrial discovery. Additionally, both Faucher and Kaufman testified that the "correctly exercised" language was included in the December 21 letter because Strange threatened to sue them if it was not.

¶ 22    On December 28, 2015, Kaufman forwarded Strange a revised contract proposal that required the purchaser to, among other things, deposit an additional $100,000 into a joint escrow account to cover the cost of the environmental remediation. Strange objected, arguing that the escrow and environmental indemnification were not required by the option. Strange asserted that Fitz had engaged in "a campaign to obstruct the closing by demanding that a contract be entered into to supplement the option terms." Strange further stated that Ontario "has been ready and willing to close since early December 2015" and that "the purchase price of $4,500,000 is clear" under the terms of the option.

¶ 23    On January 6, 2016, Strange sent Kaufman a new proposed contract removing the environmental escrow requirement. A week later, on January 13, 2016, Strange emailed Kaufman again to inquire about the status of the negotiations. On January 26, 2016, MRR emailed both Strange and Kaufman asking them to "[p]lease provide an update." It does not appear that Fitz responded to any of these emails.

¶ 24                                    D. The Pleadings

¶ 25    On January 28, 2016, Fitz filed a single-count complaint for a declaratory judgment that Ontario did not properly exercise its option to purchase the Property. In March 2016, Ontario filed a counterclaim arguing that Fitz committed an anticipatory breach of option contract and seeking an order for specific performance requiring Fitz to sell the Property according to the terms of the option. In April 2016, Fitz filed a separate eviction action against Ontario on the basis of unpaid

rent. On March 14, 2017, the trial court entered an order granting Ontario's motion to consolidate the declaratory judgment and eviction actions. The order stated that "Case 16-M1-707333 [the eviction action] is consolidated into case 16-CH-01246 [the declaratory judgment action] now pending before Judge Sophia Hall, Calendar 14."

¶ 26    Over the course of the litigation below, Fitz amended its declaratory judgment complaint several times. The fifth amended complaint, which is the operative complaint for this appeal, raised the following seven counts: declaratory judgment that the purchase option was not properly exercised (count I); breach of guarantees against David and Renee Lynn (counts II though V); recission of the lease amendment (count VI); and declaratory judgment for access to the Property (count VII).

¶ 27                              E. Trial and the Court's Decision

¶ 28    A bench trial was held over 10 days beginning on February 26, 2019. The Lynns, Faucher, and Kaufman all testified as described above. Bill Mountin, the "accountant bookkeeper" for Fitz, also testified to certain amounts allegedly owed by Ontario. Finally, Gerald Nudo, the managing member of MRR, testified that the members of MRR had access to well over $4.5 million in December 2015 and had "committed to fund the money" to purchase the Property. Nudo also testified that MRR was "ready, willing, and able to close at that time," and would have done so "pending legal documentation."

¶ 29    On December 22, 2020, the circuit court issued a written decision following trial. First, the court ruled that Ontario properly exercised its option to purchase the Property through its November 18, 2015 letter. The court rejected Fitz's argument that Ontario could not exercise its option because it was in default on the lease, noting that absence of default was not a prerequisite under the terms of the option. The court further found that, in any event, the MRR Agreement was

not an assignment of Ontario's option to purchase, reasoning that the agreement first required Ontario to exercise its option against Fitz. The court also rejected Fitz's argument that the proposed contract attached to Ontario's November 18 letter constituted a counteroffer, finding that the proposed contract was requested by Kaufman and Fitz. Based on its ruling that Ontario properly exercised its option, the court also ruled against Fitz on its claims for breach of guarantee against the Lynns.

¶ 30     The court further found that Fitz committed an anticipatory breach of the option contract by refusing to set a closing date and demanding that Ontario fulfill obligations not required by the option.  The court found that Faucher engaged in "intentional deception" and "intended to mislead Ontario" regarding Fitz's negotiations and willingness to honor the option exercise.

¶ 31     However, the court denied Ontario's counterclaim for specific performance. The court stated that although a nonbreaching party need not tender performance in the case of an anticipatory breach, the nonbreaching party must still show that it is ready, willing, and able to perform its end of the agreement. The court reasoned that Ontario had not made this showing in part because it "did not present evidence that it had control of the $4,500,000 needed to close on the purchase of the property."

¶ 32     Ontario filed a motion to reconsider, arguing that it was entitled to specific performance. The court denied the motion to reconsider on February 25, 2021. Ontario filed a timely notice of appeal. Fitz filed separate cross-appeals attacking the circuit court's judgment with respect to Ontario and the Lynns. In November 2021, we granted Fitz's motion to consolidate its appeals.

¶ 33                                    II. ANALYSIS

¶ 34                                    A. Jurisdiction

- 10 -

¶ 35 We first briefly address our jurisdiction over this appeal, as this court always has an independent duty to consider its own jurisdiction and dismiss an appeal where jurisdiction is lacking. *Xcel Supply LLC v. Horowitz*, 2018 IL App (1st) 162986, ¶ 26. Fitz asserts only that we have jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017) because the appeal is from a "final judgment *** disposing of all claims." Ontario also contends that we have jurisdiction, but alerts us to "possible jurisdiction issues" stemming from the pendency of Fitz's eviction action.

¶ 36 Appellate jurisdiction is limited to the review of final judgments unless an order falls within a statutory or supreme court exception. *In re Marriage of Sanchez and Sanchez-Ortega*, 2018 IL App (1st) 171075, ¶ 21. If a final judgment disposes of fewer than all claims in a matter, that judgment is immediately appealable only if the trial court makes "an express written finding that there is no just reason for delaying either enforcement or appeal or both." Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 37 In this case, the trial court's order did not dispose of Fitz's eviction claims or contain a Rule 304(a) finding. Thus, whether the order is immediately appealable depends on the nature of the consolidation of the declaratory judgment and eviction actions. Generally, pending actions may be consolidated "as an aid to convenience, whenever it can be done without prejudice to a substantial right." 735 ILCS 5/2-1006 (West 2016). Illinois courts have recognized three distinct forms of consolidation: (1) where multiple pending actions involve the same subject matter, the court may stay the proceedings in all but one of the cases and determine whether the resolution of one action may settle the others; (2) where multiple actions involve the same general events, the consolidation may be limited to a joint trial with separate docket entries and judgments; and (3) where multiple actions are pending that might have been brought as a single action, the cases may

be merged into one action thereby losing their individual identities. *Trilisky v. City of Chicago*, 2019 IL App (1st) 182189, ¶ 21. When consolidated actions maintain separate identities, an order disposing of one of the actions is considered final and immediately appealable without a Rule 304(a) finding. *Adoption of S.G. v. S.G.*, 401 Ill. App. 3d 775, 781 (2010). However, where cases are truly merged into one action, the disposal of fewer than all claims is not appealable absent a Rule 304(a) finding. *Id.*

¶ 38    Here, the record shows that the consolidation was done solely for convenience, and the declaratory judgment action and the eviction action maintained separate identities and docket numbers. For example, shortly after the trial, the court entered an order clarifying that "Consolidated Case No. 16 M1 70733 [the eviction action] was stayed and not tried with Case No. 16 CH 1246" and that the eviction action was "to be submitted for disposition after Case No. 16 CH 1246 has been decided." That same day, the court entered another order stating that "Fitz's motion to sever is granted with Case No. 707333 severed and bifurcated from Case No. 16 CH 1246, with court to continue to retain jurisdiction over Case No. 707333." Additionally, the court's December 22, 2020 order entering judgment on the trial states that "[a] status hearing is set on the forcible entry and detainer action (Case no. 16 M1 707333) [.]"

¶ 39    To be sure, we recognize that at a posttrial hearing, the court opined that its decision was "not final because there was still the eviction matter pending." Notwithstanding the court's comment, we find that the cases maintained separate identities with separate docket entries. See *In re Marriage of Harnack and Fanady*, 2014 IL App (1st) 121424, ¶ 41 (consolidation was merely for convenience where separate case numbers were retained and separate judgments were to be entered in each case). The court's order disposing of all claims in the declaratory judgment action was therefore a final order that is appealable without a Rule 304(a) finding. *Id.* Additionally, we

note that the notices of appeal were timely filed following the denial of Ontario's motion to reconsider. Thus, we have jurisdiction over this appeal.

¶ 40                                    B. Ontario's Motion to Strike

¶ 41    As another preliminary matter, Ontario asks this court to either strike or disregard portions of the statement of facts in Fitz's brief on appeal for being "replete with arguments and improper comments" in violation of Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). Rule 341(h)(6) requires that a party's brief provide the reviewing court with "the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment[.]" *Id.* We agree with Ontario that, in several instances, Fitz's statement of facts includes arguments and improper editorializations. However, "[w]here violations of supreme court rules are not so flagrant as to hinder or preclude our review, the striking of a brief is unwarranted." *In re Marriage of Wendy S. and George D.*, 2020 IL App (1st) 191661, ¶ 15. In this case, Fitz's violations do not significantly interfere with our ability to review the issues on appeal. We therefore deny Ontario's motion to strike, but will disregard those portions of Fitz's brief that violate Rule 341(h)(6).

¶ 42                              C. Ontario's Exercise of the Option

¶ 43    Turning to the merits, we first address Fitz's argument that the trial court erred in finding that Ontario properly exercised its option to purchase the Property.

¶ 44    When a party challenges the trial court's ruling in a bench trial, our standard of review is whether the court's judgment was against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A decision is against the manifest weight of the evidence only if the opposite conclusion is apparent, or if the findings are arbitrary, unreasonable, or not based on the evidence. *Brian J. Wanca, J.D., P.C. v. Oppenheim*, 2023 IL App (1st) 220273, ¶ 27. This is a deferential standard under which a reviewing court will not

substitute its own judgment for that of the trial court on matters involving witness credibility, the weight to be given to the evidence, and the inferences to be drawn from the evidence. *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶ 46. To the extent the issues on appeal require construction of a contract as a matter of law, our review is *de novo*, meaning we perform the same analysis that a trial judge would. *Wiczer v. Wojciak*, 2015 IL App (1st) 123753, ¶ 33. However, the factual findings that inform any interpretation of a contract remain subject to reversal only if they are against the manifest weight of the evidence. *Id.*

¶ 45    Generally speaking, an option is a contract by which a property owner gives another person the right to purchase his property for a fixed price within a certain period of time. *Morris v. Goldthorp*, 390 Ill. 186, 191 (1945). An option has two elements: (1) the owner's unilateral offer to sell, which does not create a contract until it is accepted; and (2) an agreement to leave the offer open for the specified period of time. *Whitelaw v. Brady*, 3 Ill. 2d 583, 589 (1954). A contract for sale is created only when the option is exercised, which is to say that the offer to sell is accepted according to its terms. *Bruss v. Klein*, 210 Ill. App. 3d 72, 79 (1991). A contract is not created unless the option holder exercises the option in "strict conformity" with the terms of the option. *Id.*

¶ 46    As noted above, the option provision in the parties' original lease provided that Ontario:

"shall have an option to purchase the premises and terminate this lease by giving 45 days written notice of the intent to purchase. *** The date notice is given shall set the price. All transaction[s] must close within 90 days of giving notice and price shall be the price at the time of giving notice. The unpaid rent at the time of purchase shall be discounted by a minimum of 25%."

The option provision was then amended in 2012 to set the purchase price at $4.5 million for an exercise occurring in 2015. Thus, the terms of the option required only that Ontario give 45 days' written notice in 2015 and be willing to close the transaction within 90 days of that notice.

¶ 47     There is no dispute that on November 18, 2015 Ontario emailed a letter to Fitz stating that Ontario "hereby formally exercises the right to purchase the property for $4,500,000." Ontario's letter also stated that it was "providing a formal letter so that there is no question that the option is being exercised" and that "[t]he exercise of the option is unconditional." At the same time, Ontario also sent Fitz a proposed contract to effectuate the sale at the price dictated by the option. We agree with the trial court that this was sufficient for Ontario to exercise its option. Nothing more was required under the plain language of the contract.

¶ 48     Even so, Fitz raises several arguments as to why Ontario did not properly exercise its option. First, Fitz contends that the lease should be deemed "null and void" because Ontario was in uncurable default for various reasons. Specifically, Fitz maintains that Ontario defaulted on the lease by failing to pay rent and other expenses, assigning its option rights to MRR, causing the Property to become encumbered by a lien from MRR, and failing to open a restaurant on the Property. However, the existence of defaults does not prevent a lessee from exercising its option to purchase where the absence of default is not a prerequisite to exercising the option. *Cole v. Ignatius*, 114 Ill. App. 3d 66, 73 (1983). As the trial court found, nothing in the parties' lease required Ontario to be free of default in order to exercise its option. Moreover, Fitz did not attempt to invalidate the lease until well after Ontario exercised its option in November 2015. Thus, even accepting that Ontario defaulted on the lease, this does not affect its ability to exercise its option. See *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 218 n.3 (where the lessee's option right is "not conditioned upon compliance with its obligations under the lease," the

lessee's "alleged default prior to the exercise of its option would not affect its right to purchase the Premises where no forfeiture had been declared").

¶ 49    Fitz further argues that Ontario did not properly exercise its option because the proposed contract attached with its November 18 letter included various provisions outside the scope of the language of the option provision. Thus, Fitz characterizes the November 18 letter and contract proposal not as an acceptance of its option offer, but as a rejection of the option and a counteroffer.

¶ 50    It is true that "[t]he lessee must exercise the option in strict conformity with all conditions prescribed and not waived by the lessor." *Id.* at 217. In this case, the terms of Fitz's offer to sell the Property were quite general, providing only that Ontario could "purchase the premises and terminate this lease" for a fixed price during a certain time period. In that sense, the various proposed contracts sent by both parties in this case were attempts to fill in important details not spoken to in the option itself. However, this does not mean that the option was substantially indefinite so as to prevent the formation of a valid contract.

¶ 51    We also note that the parties disagree as to who requested the initial contract proposal in the first place. According to Ontario's November 18 letter, the proposed contract was included at Fitz's request. Fitz maintains on appeal that it did not request such a contract. The trial court agreed with Ontario, stating in part that "[t]he fact that Kaufman requested that Ontario also provide the proposed contract included [in the November 18 letter] naming Fitz as seller and MRR as buyer is supported by their subsequent negotiations."

¶ 52    Our review of the record confirms that it was Fitz who wanted to negotiate the contract formed by the exercise of the option. Faucher testified that, when informed of Ontario's intent to exercise its option, he instructed Kaufman to "begin negotiations." Although Kaufman denied requesting the specific proposed contract sent by Ontario, he later also testified that he "d[id]n't

remember if [he] requested the contract or not." In any event, nowhere in the "[t]remendous back and forth" between the parties does it appear that Fitz objected to the exercise on the grounds that Ontario's contract proposals contained terms not included in the option. We also note that Fitz specifically conceded in writing that Ontario properly exercised its option on December 21, 2015, by which point the parties had been negotiating contract proposals for over a month. Thus, at the very least, Fitz waived the argument that the course of negotiations constituted a rejection of the option. See *Id.* (conditions for acceptance of an option may be waived by the lessor).

¶ 53    We further note that it was Ontario, not Fitz, that eventually insisted on closing according only to the terms of the option. The record is clear that Fitz refused to close without being indemnified for the cost of environmental remediation and receiving past due rent from Ontario, neither of which were required under the option. Ontario refused these conditions and, according to Strange's email correspondence with Kaufman, "made clear that [Ontario] was prepared to close based solely on the option contract with each side paying its customary costs." Based on this record, we cannot say that the trial court's finding that Ontario did not reject the option was against the manifest weight of the evidence. Accordingly, we affirm the trial court's finding that Ontario properly exercised its option in this case.

¶ 54                            D. Fitz's Recission Claim

¶ 55    Fitz next argues that the trial court erred in denying its claim that the lease amendment should be rescinded due to Ontario's substantial nonperformance. A party may seek recission of a contract only where there has been a substantial nonperformance or breach by the other party. *Solar v. Weinberg*, 274 Ill. App. 3d 726, 733 (1995). A substantial nonperformance occurs when the breaching party's failure to perform is of such importance that the contract would not have been made without it. *Id.* A party seeking recission must allege (1) substantial nonperformance or

breach by the other party and (2) that the parties can be restored to the status quo *ante* if the contract is rescinded. *Horwitz v. Sonnenschein Nath and Rosenthal LLP*, 399 Ill. App. 3d 965, 973 (2010).

¶ 56    Here, Fitz argues that Ontario substantially breached the lease amendment by failing to pay the reduced arrearage of $175,000. Fitz therefore concludes that the "[t]he entire lease amendment should be rescinded," thereby restoring the option price to $6 million as contained in the original lease.

¶ 57    The problem with this argument is that Fitz did not seek to rescind the lease amendment until long after Ontario exercised its option in November 2015. It is well-settled that once an option to purchase is exercised, "it becomes a present contract for the sale of the property and the lease agreement extinguishes, thereby transforming the parties' relationship from lessor-lessee to vendor-vendee." *Wendy and William Spatz Charitable Foundation v. 2263 North Lincoln Corp.*, 2013 IL App (1st) 122076, ¶ 28. Additionally, "if the lessee properly exercises the option, the lessor loses any rights that it may have had under the lease." *Id.* As we have already found that Ontario properly exercised its option to purchase the Property in November 2015, we also find that the lease ceased to exist at that time. Indeed, the language of the option provision itself expressly provides that a proper exercise will "terminate this lease." Thus, it is now too late for Fitz to seek recission of a lease that no longer exists. See *Wolfram*, 328 Ill. App 3d at 217 (when an option is properly exercised, the lessor is "precluded from attempting to defeat the option by declaring a forfeiture based on a breach that occurred either prior to or after the option was exercised"). Consequently, Fitz's recission claim was properly denied. For similar reasons, we also reject Fitz's related claims that Ontario and the Lynns are liable for the full arrearage amount and rent for the Property since November 2015.

¶ 58                                  D. Specific Performance

¶ 59 We now address Ontario's argument that the trial court erred in denying it specific performance. To sustain a claim for specific performance, a plaintiff must show (1) the existence of a valid, binding, and enforceable contract; (2) performance of the contract by the plaintiff or proof that the plaintiff was ready, willing, and able to perform the contract; and (3) the defendant's failure or refusal to perform its part of the contract. *McGoey v. Brace*, 2022 IL App (1st) 210322, ¶ 24. However, specific performance is generally not available as a matter of right, even where a contract is otherwise clear and unambiguous. *Id.* Rather, "[s]pecific performance is an equitable remedy and is a matter of sound judicial discretion controlled by established principles of equity and exercised upon a consideration of all the facts and circumstances of a particular case." *Omni Partners v. Down*, 246 Ill. App. 3d 57, 62 (1993). A trial court may refuse to grant specific performance if such a remedy would cause an inequitable result, or where damages provide an adequate remedy at law. *Dixon v. City of Monticello*, 223 Ill. App. 3d 549, 560-61 (1991). Additionally, specific performance should not be granted unless it is supported by "clear, explicit, and convincing evidence." *Butler v. Kent*, 275 Ill. App. 3d 217, 227 (1995). A trial court's decision on whether to grant or deny specific performance will not be disturbed on appeal absent an abuse of the court's discretion. *Omni Partners*, 246 Ill. App. 3d at 62.

¶ 60 Here, the trial court denied Ontario specific performance on the basis that Ontario had not proven it was ready, willing, and able to pay the $4.5 million purchase price. In so finding, the court cited *Epstein v. Howard*, 5 Ill. App. 2d 553, 558 (1955), for the propositions that (1) a buyer is considered able to make a purchase when it has " 'sufficient funds on hand or [the] ability to command the necessary funds in the time allowed by the offer' " and (2) " 'the purchaser cannot show ability [to pay] by depending on third persons in no way bound to furnish the funds.' "

¶ 61    On appeal, Ontario contends that the trial court's reliance on *Epstein* is misplaced, as that case involved a real estate broker's right to a commission rather than a buyer's right to specific performance. In any event, Ontario also maintains that it was not required to prove that it had the ability to purchase the Property had Fitz been willing to close.

¶ 62    We find that the trial court employed the correct legal standard. It remains the general rule that a party can obtain specific performance "only upon establishing either that the party has performed according to the terms of the contract or that the party was ready, willing, and able to perform, but was prevented, and thus excused from doing so by the acts or conduct of the other party." *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 477 (2004); see also *Lobo IV, LLC v. V Land Chicago Canal, LLC*, 2019 IL App (1st) 170955, ¶ 64; *Omni Partners*, 246 Ill. App. 3d at 63; *Regan v. Garfield Ridge Trust and Savings Bank*, 220 Ill. App. 3d 1078, 1085 (1991); *Tantillo v. Janus*, 87 Ill. App. 3d 231, 234 (1980).

¶ 63    Whether Ontario proved that it was ready, willing, and able to perform its end of the option contract is a factual determination which will not be disturbed unless it is against the manifest weight of the evidence. *Hoxha v. LaSalle National Bank*, 365 Ill. App. 3d 80, 84 (2006). Our review of the record shows that the trial court's finding that Ontario was not ready, willing, and able to pay the purchase price was supported by the evidence. Notably, Ontario never paid or escrowed any part of the purchase price. Indeed, Ontario presented essentially no evidence that it had $4.5 million in 2015. The evidence in fact suggested the opposite, as Ontario was deeply in arrears on its obligations to Fitz and had not yet opened any business on the Property.

¶ 64    Rather than supply its own money, Ontario relied on funds from MRR to fulfill the option contract. To that end, Ontario contends that it proved its ability to pay the purchase price because Nudo testified that MRR had sufficient funds and was willing to pay if a deal was reached.

However, this court has stated that "[a] purchaser is not shown to have financial ability if he is depending upon third persons who are in no way bound to furnish the funds." *Nelson v. Bolton*, 72 Ill. App. 3d 519, 525 (1979). Despite Nudo's testimony, Ontario did not present evidence that MRR was actually legally bound to supply the funds. As Fitz points out, the proposed contract delivered to Fitz and many of the proposed revisions thereof state that the contract is "wholly contingent" on MRR and Ontario satisfying certain conditions at or before closing. MRR also retained the right not to fund the transaction if "for any reason" and "in its sole discretion" it was dissatisfied with the condition of the Property or any documentation related to the Property. Under these circumstances, we cannot say that the trial court's decision to deny Ontario specific performance was against the manifest weight of the evidence.

¶ 65    Finally, we note that Ontario raises a policy argument as to why requiring a plaintiff to prove its ability to perform "makes no sense" and "is just bad precedent." Specifically, Ontario contends that such a rule allows a breaching seller to learn information about a buyer's finances that the seller would normally not be privy to otherwise. Ontario also asserts that strict application of the rule would "severely limit or eliminate specific performance as a viable remedy" because it would be overly burdensome for a buyer to secure and prove the ability to pay.

¶ 66    These arguments are unpersuasive. First, as explained, it has long been Illinois law that a plaintiff must demonstrate an ability to perform in order to obtain specific performance. See, *e.g.*, *Schwinder*, 48 Ill. App. 3d 461, 477 (2004). Second, while the availability of specific performance depends on the specific facts and circumstances of each case, a buyer can theoretically prove its ability to perform in any number of simple ways. For example, a buyer could show that it owns and is willing to sell assets valuable enough to cover the purchase price. *Regan*, 220 Ill. App. 3d at 1086-87; *Tantillo*, 87 Ill. App. 3d at 238-39. The ability to pay might also be established through

testimony that the buyer itself had sufficient funds available. *Omni Partners*, 246 Ill. App. 3d at 60; *Djomlija v. Urban*, 107 Ill. App. 3d 960, 963 (1982). Additionally, a buyer's payment of earnest money or the escrow of the necessary funds will typically be strong evidence of its ability to perform. Simply put, Ontario's arguments do not provide any compelling reason to disturb the trial court's judgment. The trial court's judgment was not against the manifest weight of the evidence.

¶ 67                                    III. CONCLUSION

¶ 68     For the reasons stated, we affirm the judgment of the circuit court.

¶ 69     Affirmed.